COUNTY OF MONROE,
Plaintiff-Appellant,

v.

STATE OF FLORIDA and State of New York, Defendants-Appellees,

and

Metropolitan Dade County, Florida, Defendant.

No. 738, Dockets 79–7745, 81–7229.

United States Court of Appeals, Second Circuit.

Submitted April 13, 1981.

Decided May 4, 1982.

Nira T. Kermisch, Rochester, N. Y. (John D. Doyle, County Atty., Monroe County, Rochester, N. Y., of counsel), for plaintiff-appellant.

Martin S. Friedman, Asst. Atty. Gen., Tallahassee, Fla. (Jim Smith, Atty. Gen. of State of Fla., Tallahassee, Fla., of counsel), for appellee State of Fla.

William J. Kogan, Asst. Sol. Gen., Albany, N. Y. (Robert Abrams, Atty. Gen. of State of N. Y., Jeremiah Jochnowitz, Asst. Sol. Gen., Albany, N. Y.), for appellee State of N. Y.

Before MANSFIELD, NEWMAN, Circuit Judges, and SIFTON,* District Judge.

MANSFIELD, Circuit Judge:

The County of Monroe in the State of New York appeals from an order of the District Court for the Western District of New York, entered by the late Judge Harold P. Burke, dismissing for lack of jurisdiction the County's claims against the states of Florida and New York for the recovery of expenses incurred by the County in apprehending, holding and extraditing a fugitive from the State of Florida. The district court dismissed the action against the State of Florida for lack of jurisdiction and dismissed the action against the State of New York on several grounds, including failure of the plaintiff to allege any federal cause of action against the State, the State's Eleventh Amendment immunity and the lack of diversity of citizenship between plaintiff and the State. We affirm the decision of the district court as to the State of New York but reverse as to the State of Florida.

The suit arises out of the demand by the State of Florida upon the State of New York for extradition of one Jerry Michael Davis under the Federal Extradition Act, 18 U.S.C. §§ 3181 et seq. (hereinafter the "Act"). Section 3182 authorizes the executive authority of any state to make a demand of the executive authority of any other state for the return of a fugitive. The section sets forth the procedures for making that demand and places a duty on the state on which demand is made to apprehend, secure and deliver the fugitive to the demanding state. Section 3195 provides in relevant part that "[a]ll costs or expenses incurred in any extradition proceeding in apprehending, securing, and transmitting a fugitive shall be paid by the demanding authority."

On September 14, 1977, the Governor of the State of Florida, pursuant to a request from the Sheriff of Dade County, signed and properly executed a demand for the extradition of one Jerry Michael Davis who was wanted in Metropolitan Dade County. The demand was forwarded to Governor Carey of the State of New York who, on October 3, 1977, executed a warrant addressed to the Sheriff of the County of Monroe instructing the Sheriff to apprehend Davis and deliver him to a Sergeant Rencke of Miami, Florida. On November 2, 1977, Davis was duly arrested by the Rochester Police Department and placed in the Sheriff's custody. On November 8, 1977, while in the custody of the Sheriff, Davis became ill and was taken to Rochester General Hospital where he underwent major surgery. Davis remained in the hospital until December 21, 1977, and was delivered to the Florida authorities on February 3, 1978.

The County of Monroe incurred heavy expenses in its efforts to comply with Florida's demand for extradition. The cost of Davis' medical care amounted to $7,841.85, for which the County was liable since New York law requires the Sheriff to pay the medical expenses incurred by all prisoners in his custody. The County sustained the additional expenses of $7,747.14 for providing a 24-hour-a-day guard service while Davis was in the hospital. The County requested the State of New York, the State of Florida and Metropolitan Dade County to

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

pay the expenses of $15,588.99, but they each refused. Thereupon the County commenced this action, invoking federal jurisdiction under § 3195. On October 1, 1979, the late Judge Harold P. Burke dismissed the County's claims against the States of Florida and New York for failure to state a claim and for lack of personal jurisdiction over the State of Florida, from which the County sought to appeal. By order dated June 30, 1980, we dismissed the appeal for lack of jurisdiction, since the complaint remained outstanding against the defendant Metropolitan Dade County which was served, appeared and filed an answer, but retained jurisdiction pending the entry by the district court on remand of a certification order pursuant to Rule 54(b) of the Fed.R.Civ.P., which was signed by the district court on March 6, 1981.[1]

## DISCUSSION

In order to maintain this action, the County must establish that 18 U.S.C. § 3195 creates a federal cause of action against the states of Florida and New York and, if so, that it is not barred by the Eleventh Amendment.

Although § 3195 does not expressly provide for a cause of action, one may be implied against the State of Florida under the standards announced in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis*, 440 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981); *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981); *Texas Industries, Inc.*

*v. Radcliff Materials, Inc.*, 451 U.S. 630, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981). What must ultimately be determined is whether Congress intended to create the private remedy asserted. *Transamerica, supra*, 400 U.S. at 15–16, 100 S.Ct. at 245; *Redington, supra*, 442 U.S. at 568, 99 S.Ct. at 2485; *Cannon, supra*, 441 U.S. at 688, 99 S.Ct. at 1952; *Texas Industries, Inc., supra*, 451 U.S. at 639, 101 S.Ct. at 2066. To discern that intent we begin with the language of the statute itself. *Id.*

The plain language of § 3195 expressly states that the demanding authority shall pay all costs and expenses arising out of its demand for extradition. Monroe County, the entity which, in compliance with the request of the demanding authority (Florida) incurred the expenses of apprehending, securing and delivering up the fugitive, is clearly within the class of persons which the statute was designed to protect. See *Cannon*, 441 U.S. at 688, 99 S.Ct. at 1952. As in *Transamerica*, the "statutory language itself fairly implies a right to specific and limited relief in a federal court." 440 U.S. at 18, 100 S.Ct. at 246. By specifically providing that the demanding authority shall be liable for costs, § 3195 by its terms contemplates that a claim may be asserted against it by the party incurring the costs necessitated by compliance with its demand.

The legislative history of § 3195, though sparse, buttresses that view. The predecessor of § 3195 was first enacted as part of the Act of 1793 Respecting Fugitives From Justice. See Ch. 7, § 1, 1 Stat. at L. 302 (Feb. 12, 1793), which gave effect to and established the procedures for enforcing the language of Art. IV, § 2, Clause 2 of the Constitution. E.g., *Innes v. Tobin*, 240 U.S. 127, 130–31, 36 S.Ct. 290, 291, 60 L.Ed. 562 (1916); see 2 Moore on Extradition and

---

**1.** Although Dade County filed an answer it did not file a motion to dismiss and the district court's dismissal order makes no reference to it. Since it is therefore not a party to this appeal we limit ourselves to the dismissal of the claims against the states of Florida and New York.

Moreover, although the district court dismissed the complaint against the State of Flori-

da for lack of personal jurisdiction, nothing in the record suggests that Florida objected to the exercise of personal jurisdiction over it. Since Florida thus waived this defense the dismissal on this ground is reversed and we limit ourselves to consideration of whether the complaint states a cause of action against the states of Florida and New York.

Interstate Rendition, 840 *et seq.* (1891). Clause 2 of Art. IV, § 2 of the Constitution provides:

"A person charged in any State with Treason, Felony, or other Crime, who shall flee from Justice, and be found in another State, shall on demand of the executive Authority of the State from which he fled, be delivered up, to be removed to the State having jurisdiction of the Crime."

Shortly after ratification of the Constitution, however, it was determined that the constitutional provision was not self-executing, since it failed to specify the authority upon whom the demand is to be made, the form of the demand, the methods to be pursued in recovering the fugitive or the liability for the costs incurred. These problems were the subject of an exhaustive report prepared by Edmund Randolph, the then Attorney General of the United States.[2] The report reads in relevant part:

"To deliver up is an acknowledged Federal duty; and the law couples with it the right of using all incidental means in order to discharge it. I will not inquire here how far these incidental means, if opposed to the constitution and laws of Virginia, ought, notwithstanding, to be exercised; because McGuire and his associates may be surrendered without calling upon any public officer of that State. Private persons may be employed, and clothed with a special authority. The attorney-general agrees that a law of the United States might so ordain; and wherein does a genuine distinction consist between a power deducible from the Constitution, as incidental to a duty imposed by that Constitution, and a power given by Congress as auxiliary to the execution of such a duty? *Money, indeed, must be expended; and a State may suspend its exertions until the preliminary proofs are adduced. I cannot undertake to foresee whether the expending State will be reimbursed.* If the Constitution will uphold such a claim, it will, doubtless, be enforced. If it will not, it must be remembered that that instrument was adopted with perfect free will." Reprinted in 2 Moore, *supra* at 844–45 (emphasis added).

We know little of the legislative history of the Act of 1793 since the congressional debates of neither the Senate nor the House were then published. However, Congress responded directly to Randolph's concern about costs by expressly requiring in what is now § 3195 that the demanding state pay all costs of apprehending, securing and transmitting the fugitive.[3] Since there is

---

**2.** The problems had been voiced by the Governor of Virginia in 1791 to the Governor of Pennsylvania as reasons for declining to comply with Pennsylvania's demand for the extradition of a fugitive. The Governor of Pennsylvania protested the decision of Virginia to President Washington who referred the matter to Attorney General Randolph. 2 Moore, *supra*, at 840–42.

**3.** As originally enacted the statute read:

"Chap. VII. *An Act respecting Fugitives from Justice, and persons escaping from the Service of their Masters.*

"Section 1. *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That whenever the executive authority of any state in the Union, or of either of the territories northwest or south of the river Ohio, shall demand any person as a fugitive from justice, of the executive authority of any such state or territory to which such person shall have fled, and shall moreover produce the copy of an indictment found, or an affidavit made before a magistrate of any state or territory as aforesaid, charging the person so demanded, with having committed treason, felony or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged fled, it shall be the duty of the executive authority of the state or territory to which such person shall have fled, to cause him or her to be arrested and secured, and notice of the arrest to be given to the executive authority making such demand, or to the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear: But if no such agent shall appear within six months from the time of the arrest, the prisoner may be discharged. *And all costs or expenses incurred in the apprehending, securing, and transmitting such fugitive to the state or territory making such demand,* shall be paid by such state or territory."

1 Stat. at L. 302 (latter emphasis added). All but the last sentence of the above section is now contained, in somewhat modified form, in

no other remedy available to enforce that provision, we may fairly infer that Congress intended that it be enforced by the judiciary upon filing of a claim by the proper party. Otherwise the statute would merely create a right without a remedy, amounting to a mere exhortation that demanding states meet their obligations under the Act. We believe Congress did not intend a useless act but to provide a remedy for enforcement of an acknowledged right.

Since the language and focus of the statute, read in the light of its legislative history, clearly reveal a congressional intent to create a cause of action, the third and fourth factors identified in *Cort v. Ash* as indicia of congressional intent—the need for a private remedy to effectuate the Act's purposes and the fact that it may not be one traditionally relegated to state law— become of doubtful relevance. *Redington, supra,* 442 U.S. at 575–76, 99 S.Ct. at 2488–89. See, e.g., *Transamerica, supra,* 444 U.S. at 18–19, 100 S.Ct. at 246. However, an analysis of these factors buttresses the propriety of implying a cause of action under § 3195. The purpose of extradition is to provide a procedure whereby states can promptly aid one another in bringing to trial persons accused of crimes by preventing them from finding asylum in another state. "Its design was and is, in effect, to eliminate ... the boundaries of States, so that each may reach out and bring to speedy trial offenders against its laws from any part of the land." *Biddinger v. Commissioner of Police,* 245 U.S. 128, 133, 38 S.Ct. 41, 42, 62 L.Ed. 193 (1917). The implication of a right of action to enforce the rights and duties created by § 3195 is not only entirely consistent with the strong federal interest in ensuring cooperation among the states, but is necessary to effectuate that goal. If entities such as the state of New York and Monroe County had no assurance that they would recover expenses incurred in complying with an extradition demand, they might delay, suspend or otherwise fail to comply with the demand, thus frustrating the federal interest in speedy extradition. In addition, ever since the adoption of the Constitution and the enactment of federal legislation in 1793, extradition has been a matter of federal, not state, law; indeed, it is established that conflicting state law is preempted by federal law. E.g., *Innis v. Tobin, supra,* 240 U.S. at 131, 36 S.Ct. at 291; *DeGenna v. Grasso,* 413 F.Supp. 427 (D.Conn.), *aff'd,* 426 U.S. 913, 96 S.Ct. 2617, 49 L.Ed.2d 368 (1976); *Smith v. State of Idaho,* 373 F.2d 149 (9th Cir. 1967), *cert. denied,* 388 U.S. 919, 87 S.Ct. 2139, 18 L.Ed.2d 1364 (1968). Thus both the third and fourth factors identified in *Cort v. Ash* are also satisfied.

A cause of action in federal court is therefore available against a "demanding authority" within the meaning of § 3195. The language of the Constitution and § 3182 make clear that the "demanding authority" can only be an authority located in another state, which is the entity to which the fugitive is to be returned. Here the State of Florida clearly falls within the scope of those against whom a right of action was created. The State of New York, on the other hand, not being a "demanding authority" in this case, does not. No claim therefore exists against the State of New York, and the district court properly dismissed the complaint against it for want of federal subject matter jurisdiction. A federal cause of action, however, is properly stated against the State of Florida.

*Eleventh Amendment Immunity*

We pass to the question of whether the cause of action against the State of Florida under § 3195 is barred by the Eleventh Amendment, which provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Were the plaintiff

---

§ 3182. The last sentence of the section is now the first sentence of § 3195, though the wording has been slightly altered.

here the State of New York, it could bring suit against the State of Florida in the Supreme Court, which has original and exclusive jurisdiction under Art. III, § 2, Cl. 2 of the Constitution. The issue here, however, is whether *Monroe County*, as distinguished from New York State, may, despite the Eleventh Amendment, bring suit in a federal district court against Florida.

At the outset we reject the contention that a claim under § 3195 may be implied solely in favor of the state upon which demand for extradition is made (here New York) and not in favor of the state's subdivision which actually apprehended, secured and delivered the fugitive. We decline to read § 3195 so narrowly. That statute's language does not limit the right to recover costs and expenses to the state on which demand is made, but instead explicitly states that the costs and expenses "shall be paid by the demanding authority." The demanding state's liability was intended to extend to the entity which actually incurred those costs and expenses. Practical and equitable considerations support that result. Here, for instance, New York has refused to take up the County's claim (which is for monies paid out of the County's pocket, not that of the State), let alone bring suit in the Supreme Court to recover those costs. To hold that only New York may bring suit would leave the County at the mercy of a state that has no stake in the outcome.

Our dissenting colleague, Judge Newman, would construe § 3195 as creating an implied right of action against the demanding state, Florida, only in favor of the State of New York and not in favor of its subdivision, Monroe County. He relies partly on the failure of § 3182, which obligates the executive authority of the extraditing state to deliver the fugitive, to mention the state's subdivisions. However, the statute clearly contemplated that an arrest and delivery in connection with extradition might be made by a subdivision of the extraditing state. Section 3195, which obligates the demanding authority to pay "all costs and expenses incurred", significantly does not restrict the payee to the extraditing state, as distinguished from its subdivisions. Thus it indicates that the expenses are to be paid to whatever governmental authority within the extraditing state incurred them. If Congress had wanted to limit claimants to states alone, it could easily have said so by inserting the words "by any state" so that the statute would read "All costs or expenses incurred *by any state* in an extradition proceeding ... shall be paid by the demanding authority."

In support of limiting the implied right of action for extradition expenses to extraditing states rather than extending it to state subdivisions it is urged that we should "not interpret § 3195 to interfere with an internal policy of the state as to how it chooses to discharge its extraditions obligations" (Dissent, p. 1137), and that each state should be "accorded the opportunity to determine, as a matter of internal state law, how the obligation will be discharged and how the costs of doing so will be borne." (Dissent, p. 1137). New York, however, has no policy or law against allowing each county in that state to discharge the obligation directly and to recover its costs directly from the demanding state rather than use the circuitous route of first recovering from the State of New York which would then in turn seek *reimbursement from the demanding state*. New York's unwillingness to reimburse Monroe County does not indicate any disapproval of the latter's claim against the State of Florida. On the contrary, where (as here) a New York county is obligated by New York law to "receive and safely keep the prisoner" held pursuant to the governor's warrant for extradition, see N.Y.Crim.Proc.Law §§ 570.18, 570.28,[4] the New York Attorney General has issued an opinion under almost identical circumstanc-

---

**4.** Section 570.18 provides for the governor's issuance of a warrant of arrest "which shall ... be directed to any police officer or other person whom he may think fit to entrust with the execution thereof." Section 570.28 pro- vides that a county jail must "receive and safely keep the prisoner until the officer or person having charge of him is ready to proceed on his route...."

es to the effect that a county of New York state may charge the county of another state (Michigan) for subsistence and hospitalization furnished to a fugitive extradited to that other state for criminal prosecution. See Opinions of the Attorney General for the Year Ending December 31, 1971, pp. 152–53 (informal opinion).[5] Indeed, this reflects the provision in N.Y.Crim.Proc.Law § 570.56, that "[t]he expenses of extradition must be borne by the county from which the application for a requisition comes...." In substance, therefore, New York authorizes each of its counties to pursue reimbursement directly from the demanding state rather than through New York state itself.

The Attorney General of Florida has likewise issued an opinion to the effect that a Florida county may under 18 U.S.C. § 3195 charge the authorities of another state for services performed in arresting and keeping a fugitive in connection with extradition proceedings instituted to procure his removal from Florida to that state. See Florida Attorney General Opinions, 1959–1960, Opinion 059–177, pp. 265–66. These official state opinions are inconsistent with the dissent's suggestion that the states of New York or Florida may have policies against prosecution by their subdivisions of claims against demanding states or their subdivisions for expenses incurred in connection with extradition proceedings.[6] Nor does the dissent cite any instances of states taking a different approach.

■ We need not decide whether Congress could have authorized suits by a political subdivision in conflict with its state's prohibition of such suits since that situation does not exist here. The dissent's concern that we would allow a political subdivision to "preempt" (Dissent, p. 1138) its state's wishes on whether to bring suit is therefore misplaced. To interpret § 3195 to require a state under the circumstances of this case to act as the collection intermediary would merely add an unnecessary and burdensome step in the process of implementing the section's requirement that a demanding state pay all costs of extradition. Moreover, under the dissent's interpretation, should the demanding state refuse to pay a state suing on its subdivision's behalf, the resulting suit between states would end up on the docket of an already overburdened Supreme Court, which would have original jurisdiction. Accordingly, we hold that absent the possible constitutional bar of the Eleventh Amendment, the County is a proper plaintiff under § 3195.

■ The Eleventh Amendment provides that federal judicial power shall not extend to a suit "against one of the United States by citizens of another state." Monroe County contends that the Amendment is inapplicable for the reason that it, as a county of the State of New York, is not a

---

**5.** The Attorney General stated in pertinent part:

"Research has failed to uncover any case law based upon a cause of action brought by one state or a political subdivision thereof against another state or political subdivision thereof to recover the costs and expenses of extradition. Undoubtedly there are instances where subsistence charges such as are involved in your claim are generally considered to be a matter of comity between the states. However, in a situation such as yours where the 'holding county', *i.e.,* Onondaga County, incurs out of the ordinary expenses in arresting and securing a prisoner at the request of the demanding county, it is my opinion that, based upon a reading of the above-quoted statutes, a claim for such costs and expenses is a legal obligation of the demanding county, *i.e.,* Ingham County, and should be honored by them. This conclusion, of course, assumes that such costs and expenses are 'necessary and reasonable' ones."

**6.** At oral argument counsel for the State of New York said nothing concerning any state policy on the subject of litigation of claims between states or their subdivisions for extradition expenses. Counsel for the State of Florida expressed his understanding that states usually did not bill each other for such expenses but we have found no official statement other than the earlier contrary view expressed by the Florida Attorney General, *supra.* This is a far cry from an advance disclaimer by a state of any responsibility for extradition expenses, which the Court faced in *Marbles v. Creecy*, 215 U.S. 63, 30 S.Ct. 32, 54 L.Ed. 92 (1909), cited by the dissent (footnote 5). In such a case, of course, the state or county asked to extradite would probably refuse to do so until expenses were guaranteed.

"Citizen of another State." We disagree. See *Byram River v. Village of Port Chester*, 394 F.Supp. 618 (S.D.N.Y.1975), rejecting this very contention advanced there by a plaintiff municipality. Furthermore, a county is not a "State" within the meaning of the Eleventh Amendment. *Lincoln County v. Luning*, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); *Monell v. New York City Department of Social Service*, 436 U.S. 658, 690 n.54, 98 S.Ct. 2018, 2035 n.54, 56 L.Ed.2d 611 (1978). In *Illinois v. City of Milwaukee*, 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), where the State of Illinois had sued four cities in Wisconsin, the Supreme Court rejected the defendants' contention that the suit was against the State of Wisconsin and therefore within the original jurisdiction of the Supreme Court. The Court held that the term "State" should not be read as including its political subdivisions. 406 U.S. at 98, 92 S.Ct. at 1390. We see no reason to reach a different result when the subdivision is a plaintiff. We conclude, therefore, that Monroe is a "Citizen of another State" within the meaning of the Eleventh Amendment.[7]

Turning to the question of whether Florida is entitled to Eleventh Amendment immunity against the County's claim, a brief review of leading relevant Supreme Court decisions is advisable. Adopted in 1798, the Eleventh Amendment was enacted in direct response to widespread dissatisfaction with the Supreme Court's decision in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), which held that the grant of judicial power contained in Article III, § 2 of the Constitution, extended federal jurisdiction to a suit against the State of Georgia brought by South Carolina citizens to collect a debt owed by Georgia to an estate of which plaintiffs were executors. The Eleventh Amendment served not only to reverse *Chisholm* but also to restore to Article III the original understanding that it did not provide a mechanism for making states un-

willing defendants in federal court. It restored, in other words, the "fundamental rule of jurisprudence" that "a State may not be sued without its consent." *Ex parte New York*, 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921), *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Monaco v. Mississippi*, 292 U.S. 313, 323–25, 54 S.Ct. 745, 748–49, 78 L.Ed. 1282 (1934); *Edelman v. Jordan*, 415 U.S. 651, 660–63, 94 S.Ct. 1347, 1354–55, 39 L.Ed.2d 662 (1974).

A state's Eleventh Amendment immunity, however, is not absolute but subject to abrogation by Congress in its exercise of powers delegated to it by the states in the Constitution. In *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), for instance, the State of Alabama was held liable to a damage suit in federal court by railroad employees under the Federal Employers Liability Act ("FELA"). The FELA specifically provided that "every common carrier by railroad" would be liable in damages to injured employees in "an action brought in a district court of the United States," leading the Court to conclude that Congress intended to include state-owned railroads within the FELA coverage. Turning to the question of whether Congress had the power to subject Alabama to suit, the Court found that the states by empowering Congress to regulate commerce, had "necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." 377 U.S. at 192, 84 S.Ct. at 1212.

When Congress' intent to abrogate is unclear, a state's Eleventh Amendment immunity will be upheld. *Edelman v. Jordan*, 415 U.S. 651, 672, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *Employees v. Missouri Public Health Dept.*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973). On the other hand, when Congress' intent to abrogate is clear, the state's defense of Eleventh Amendment immunity will be re-

---

**7.** Even if we were to conclude that Monroe County *is* the State of New York for the purposes of the Eleventh Amendment, that would not aid the County here since original jurisdiction over the case—a case between the states

of New York and Florida—would then lie with the Supreme Court, where the action might be commenced anew, and our dismissal would be without prejudice to such a suit being brought there.

jected. In *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976), for instance, the Court found the clear evidence of congressional purpose that it could not find in *Employees* and *Edelman*. Congress, in adopting the Equal Employment Opportunity Act of 1972, had amended Title VII of the Civil Rights Act of 1964 to include "government, governmental agencies and political subdivisions" among the employers subject to Title VII. Such congressional action, according to the Court, clearly revealed a "congressional intent to abrogate the immunity conferred by the eleventh amendment." 427 U.S. at 451, 96 S.Ct. at 2669. The only remaining issue was whether Congress possessed the power to abrogate the immunity. Treating the 1972 Act as an exercise of congressional authority under § 5 of the Fourteenth Amendment, the Court held that Congress could in fact abrogate the immunity: "When Congress acts pursuant to § 5, not only is it exercising legislative authority that is plenary within the terms of the constitutional grant, it is exercising that authority under one section of a constitutional Amendment whose other sections by their own terms embody limitations on state authority." *Id.* at 456, 96 S.Ct. at 2671.[8]

Similarly, the Court found in *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), that the Eleventh Amendment did not bar an award of attorneys fees under the Civil Rights Act of 1976. Stating that Congress had plenary power to set aside the states' immunity in order to enforce the Fourteenth Amendment, the Court concluded, despite the absence of express statutory language imposing liability on the States, that the legislative history of the Act indicated an intent by Congress to make the states liable for these litigation expenses. The Court further noted that the statute would have been rendered meaningless with respect to the states if the Act did not impose liability for

---

**8.** Commentators take the view that nothing in the language of the Eleventh Amendment limits congressional power, as distinguished from judicial power, to abrogate the states' immunity. See Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines: Part One*, 126 U.Pa.L.Rev. 515 (1978); Field, *The Eleventh Amendment and other Sovereign Immunity Doctrines: Congressional Imposition of Suits upon the States*, 126 U.Pa.L.Rev. 1203 (1978); Nowak, *The Scope of Congressional Power to Create Causes of Action Against State Governments and the History of the Eleventh and Fourteenth Amendments*, 75 Colum.L.Rev. 1413 (1975); Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv.L.Rev. 682 (1976). As Professor Nowak puts it:

> "A congressional grant of jurisdiction allowing a suit by a citizen against a state indicates that Congress has determined that the federal policy is preeminent and that the hardship on the state is not severe. The states may adjust to the congressional enactment or, if the regulation proves onerous, they may exert their influence on Congress to have it changed." *Id.* at 1442.

Professor Tribe has summarized the law on the subject:

> "It is thus not surprising that, when the Supreme Court began to consider the power of Congress to authorize damage suits against the states under article I, it exhibited a schizophrenic approach: the Court proceeded simultaneously on the premise that states had retained a sovereign immunity which could be sacrificed only by a subsequent waiver, and on the premise that states had ceded part of their sovereignty to the national government in ratifying article I, thereby creating a limitation on sovereign immunity inhering in 'the acceptance of the constitutional plan.'" Tribe, *supra*, 687–88 (footnotes omitted).

*Fitzpatrick* held that Congress had the power to abrogate the states' immunity when it acted under § 5 of the Fourteenth Amendment, the enforcement clause. There is some uncertainty as to whether Congress has similar power to abrogate the immunity when it acts under another one of its delegated powers, such as under the general powers delegated to it under Article I. The commentators cited above argue that where Congress acts under any of its delegated powers, it has the power to make the states amenable to suit. Two recent cases, *Jennings v. Illinois Office of Education, supra*, 589 F.2d at 935, and *Peel v. Florida Dept. of Transportation, supra*, 600 F.2d 1070, have held that Congress has the power to abrogate the immunity when it acts pursuant to the War Powers Clause. Whatever the merits of those positions we need not reach them here since we do not doubt that Congress, in acting pursuant to the specific authorization of Art. IV, § 2, Cl. 2, does have the power to abrogate the states' immunity in matters relating to extradition.

the attorney's fees. *Id.* at 698 n.31, 98 S.Ct. at 2577 n.31.

A state may also waive its Eleventh Amendment immunity by consenting to a suit that would otherwise be barred. *Clark v. Barnard*, 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883). Thus, in *Petty v. Tennessee Missouri Bridge Commission*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959), which involved a tort suit by a resident of Tennessee against a bi-state corporation formed by Missouri and Tennessee, the Court found that the States had waived their immunity from federal suit in the compact by which the bi-state corporation was formed. In the absence of express consent the Court has recognized that certain state conduct may constitute a waiver or a "constructive consent" to suit. In *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), for instance, the Court found that the State of Alabama, by operating a state-owned railroad, had consented to a damage suit in federal court by railroad employees under the FELA. Congress had conditioned the right to operate a railroad upon the railroad's amenability to suit, without exempting state-owned railroads. Alabama, by commencing operation of its railroad 20 years after the enactment of the FELA, was held to have accepted that condition and thus to have waived its immunity. *Id.* at 192, 84 S.Ct. at 1212. The Court concluded that it would be "surprising" to learn that Congress had made state railroads liable to employees under the FELA, yet provided "no means by which that liability may be enforced." *Id.* at 197, 84 S.Ct. at 1215. However, the evidence of such implied waiver or consent must be strong and "[t]he mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Edelman v. Jordan, supra*, 415 U.S. at 673, 94 S.Ct. at 1360.

Applying these principles here, when the states adopted Art. IV of the Constitution, they relinquished their sovereignty to regulate matters relating to extradition, granting to Congress the power to abrogate the state's immunity from suit upon claims arising out of extradition. In enacting the Federal Extradition Act Congress acted pursuant to powers granted to it by Art. IV. As the Supreme Court has stated:

> "[W]e treat the following proposition as beyond question: (a) That prior to the adoption of the Constitution fugitives were surrendered between the States conformably to what were deemed to be the controlling principles of comity . . . (b) That it was intended by the provision of the Constitution to fully embrace or rather to confer authority upon Congress to deal with such subject . . . (c) That the act of 1793 . . . was enacted for the purpose of controlling the subject in so far as it was deemed wise to do so, and that its provisions were intended to be dominant and so far as they operated controlling and exclusive of state power." *Innes v. Tobin, supra*, 240 U.S. at 130–31, 36 S.Ct. at 290–91 (citations omitted).

It is true that the Federal Extradition Act does not expressly abrogate the states' Eleventh Amendment immunity. This it could hardly have done at the outset, since it was originally enacted in 1793, well before the adoption of the Eleventh Amendment. On the other hand, this case is readily distinguishable from *Employees* and *Edelman*, where the Court found that Congress had totally failed to address the issue of state liability. Here the plain language of § 3195 and its legislative history reveal an intent by Congress to require the demanding state to pay the expenses of extradition. Like the Act involved in *Hutto*, the Act here has a "history focusing directly on the question of state liability," 437 U.S. at 698 n.31, 98 S.Ct. at 2577 n.31. Congress apparently considered and rejected the suggestion that the demanding states should escape liability for the expenses arising out of their demands for extradition. Moreover, unlike the statutes involved in *Employees* and *Edelman*, § 3195 is not part of an "intricate regulatory scheme offering alternative means of obtaining relief." *Hut-*

*to, supra,* 437 U.S. at 698 n.31, 98 S.Ct. at 2577 n.31. As in *Parden,* if the Act does not authorize suits by an entity like the County of Monroe, § 3195 is rendered virtually meaningless. Moreover, the Supreme Court has recognized that where, as here, the financial consequences of abrogating states' immunity are not particularly severe, a somewhat lesser quantum of congressional intent to abrogate the immunity is required. *Hutto, supra,* 437 U.S. at 697 n.27, 98 S.Ct. at 2577 n.27. That lesser standard has been met here. We are satisfied that Congress did not wish its clear intent to be defeated by a claim of immunity.

Moreover, Florida, by invoking the Act, impliedly consented to be sued in federal court for the extradition expenses. The instant case involves a federal statute that does not come into play until affirmatively invoked by the demanding state and that may be invoked on a limited, *ad hoc* basis as the need arises. We therefore confront a situation much different from that involving an arguable blanket waiver of the Eleventh Amendment either by a state's mere inaction or its mere continuation of substantial, on-going state programs that predated the federal enactment. See, e.g., *Edelman* and *Employees, supra.* Thus, even if congressional intent concerning the Eleventh Amendment were inconclusive, the Act here afforded Florida a free choice as to whether to partake of the benefits of the Act and forego its Eleventh Amendment protection or whether to decline to seek extradition and maintain its immunity from suit. In our view, it clearly chose to demand extradition with its "eyes wide open," *Edelman, supra,* 415 U.S. at 693, 94 S.Ct. at 1370 (Marshall, J., dissenting).

The nature of the choice presented to Florida here is a far cry from the Hobson's choice presented to the states in *Employees* and *Edelman, supra.* In neither of those cases did the state have sufficient notice that it would be liable for damages if it participated in the federal programs. In *Edelman,* for example, the State of Illinois had virtually no notice that it would be liable for wrongfully withheld welfare ben-

efits if it chose to participate in the federal welfare program; it knew only that it might lose its funding if it violated the statute. 415 U.S. at 674, 94 S.Ct. at 1361. Similarly, in *Employees* the 1966 Amendment to the FLSA which extended coverage to state employees did not give adequate notice to the State of Missouri that its long-standing operation of hospitals and training schools would now expose it to liability. 411 U.S. at 285, 93 S.Ct. at 1618. Nor did either state have a real option to discontinue its participation in the activities subject to federal regulation and forego the accompanying federal benefits. The State of Missouri in *Employees* had operated hospitals and training schools long before the FLSA was amended to cover state employees and therefore had little choice but to continue to operate those hospitals and schools. The choice between terminating "vital public services" and surrendering Eleventh Amendment immunity was "no true choice at all." *Employees, supra,* 411 U.S. at 296, 93 S.Ct. at 1624 (Marshall, J., concurring). In neither *Employees* nor *Edelman* was the state's mere continued participation in an essential federal program a "voluntary" consent to the exercise of federal jurisdiction.

Here, in contrast, Florida was truly free to decide whether or not to consent to suit in federal court. In § 3195 Congress explicitly conditioned the right of a state to demand extradition upon the demanding state's willingness to pay the costs of that extradition. Like Alabama in *Parden,* Florida was well aware that if it demanded extradition pursuant to the Federal Extradition Act it would be subject to federally imposed liabilities. By demanding extradition, Florida indicated its willingness to accept Congress' condition: pay the costs of extradition or consent to suits brought to enforce that obligation. Had Florida believed that the relatively small cost of extradition might prove too great a burden on its state treasury, it was perfectly free to decline to seek extradition. It is not being asked to forego participation in a large-scale federal program or expose itself to

unlimited potential liability. Under the Act it may pick and choose the situations in which it will seek extradition, thus limiting its liability. Moreover, Florida is the only party before this court that has had any choice at all in the matter. Under § 3182 New York has no discretion as to whether or not it should honor the demand, while Monroe County surely had no choice but to honor the warrant issued by Governor Carey.

Finally, the strong interest in having the states live up to their obligations under § 3195 outweighs the minimal invasion of Florida's state sovereignty. See generally, *Fry v. United States*, 421 U.S. 542, 547 n.7, 95 S.Ct. 1792, 1795 n.7, 44 L.Ed.2d 363 (1975). The Constitution and the implementing Act contemplate a cooperative arrangement among the states, consistent with principles of comity. To deny Monroe County the opportunity to recover the expenses incurred at the request of Florida would vitiate the federal interest in speedy and cooperative extradition. This would be inconsistent with the "plan of the Constitution." Hamilton, *Federalist* 81.

Accordingly, we hold that Monroe County is not barred by the Eleventh Amendment from bringing suit in federal court under § 3195 and remand the case for a determination of the merits of its claim. The dismissal of the claim against the State of New York is affirmed.

Affirmed in part, reversed in part and remanded.

NEWMAN, Circuit Judge, dissenting in part:

Though only a small amount of money is involved in this litigation concerning interstate extradition, the case implicates signif-icant aspects of federalism. Specifically, the issues are whether federal law creates a cause of action in favor of a county in one state to sue another state for expenses incurred in effecting the interstate extradition of a fugitive and, if so, whether the Eleventh Amendment bars such a suit in a federal district court. While I agree with the majority that a suit to recover expenses can be maintained against the demanding state by the extraditing *state*, I respectfully dissent from the ruling that such a suit is available to a *political subdivision* of the extraditing state.

The pertinent statute is 18 U.S.C. § 3195 (1976), which provides that expenses incurred in extradition proceedings shall be paid by the demanding state. I agree with the majority that this statute is properly construed to create an implied cause of action against the demanding state to recover extradition expenses.[1] *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). But, with deference, I suggest that the majority has unjustifiably concluded that the implied cause of action inures to the benefit of any entity that incurred the recoverable expenses. For several reasons, I think it is clear that Congress has created liability of the demanding state *only* to the extraditing state.

First, the language of the statute supports this conclusion. As the majority recognizes, the provisions of § 3195 were originally enacted in 1793 in a statute that included the provisions of the Federal Extradition Act that define the basic obligations of interstate extradition. 1 Stat. 302. Those provisions, now contained in 18 U.S.C. § 3182 (1976), specify that whenever the executive authority of a state makes

---

1. I also agree with the implicit premise of the majority's decision on this point that the demanding state's obligation to pay extradition expenses is an obligation enforceable by a federal court. The demanding state, having elected to request the assistance of the extraditing state, should expect that the obligation to pay expenses will be judicially enforced, at least upon a claim by the extraditing state. By contrast, the obligation of the governor of the requested state to *extradite* the fugitive, though expressed in mandatory terms by both the Constitution, Art. IV, § 2, Clause 2, and federal statute, 18 U.S.C. § 3182 (1976), has been held not to be judicially enforceable, *Kentucky v. Dennison*, 65 U.S. (24 How.) 66, 107–10, 16 L.Ed. 717 (1861), a principle apparently of current vitality, *see Monell v. New York City Dept. of Social Services*, 436 U.S. at 659, 677–79, 98 S.Ct. at 2019, 2029–30 (1978) (relying on the rationale of *Dennison*).

demand "of the executive authority of any State, District or Territory" to which a person has fled, "the executive authority" of such "State, District or Territory" shall cause the person to be arrested and delivered to the agent of the demanding state. In imposing obligations upon the "executive authority" of the extraditing state, the statute implements the Constitution's authorization for interstate extradition. U.S. Const., Art. IV, § 2, cl. 2. Simply as a matter of textual interpretation, the demanding state's obligation to pay extradition expenses runs only to the entity that is obliged to respond to the extradition demand—namely, the executive authority of the state to which the fugitive fled. Since neither the Constitution nor the statute imposes any obligation upon the County of Monroe to honor Florida's demand, and since Florida has made no demand upon the County, the statute should not be read to create an enforceable obligation against Florida in favor of the County.

The Court attempts to draw some textual support for its construction of § 3195 from the absence of language explicitly restricting the demanding state's liability to the expenses "of any state." Since the Third Congress, legislating in 1793, did not explicitly create a cause of action for extradition expenses in favor of *any* entity, it ought to be forgiven for not including limiting language to circumscribe a cause of action that is first held to be implied by this Court in 1982. At least as to such an implied cause of action we ought not to attach significance to Congress' failure to use words of limitation. Moreover, the Court appears to ascribe significance to the absence of limiting words by reading § 3195 in isolation. Since it was enacted as part of the same provision now codified in § 3182, its scope ought to be drawn from a reading of the original provision as a whole. Since the provision as enacted imposed obligations only upon the executive of the state to which the fugitive fled, the cause of action that a court is willing to hold has been implied should be available only to the state authority upon whom Congress placed the obligation that gives rise to the expenses

sought. Congress may well have contemplated, as the Court suggests, that officials of subdivisions would assist states in complying with their extradition obligations, but that is not a sufficient reason to infer that Congress authorized any entity other than the state to maintain a lawsuit to recover expenses incurred in rendering such assistance.

Second, it is highly likely that Congress intended to create an obligation for the benefit only of the extraditing state. Congress, legislating in 1793, was acutely aware of the prerogatives of the sovereign states of the newly formed Union. Only one year prior to proposing to the states the Eleventh Amendment, Congress would not likely have impliedly created an obligation of a state enforceable by any citizen or subdivision of another state that incurred expenses in connection with an extradition demand. In the absence of clear indication that Congress, in its original or any subsequent enactment, intended to confer enforceable rights upon parties other than extraditing states, courts should not broaden the scope of the implied cause of action for expenses.

The majority contends that the demanding state's liability for expenses was intended to extend to whatever entity incurred the expenses. This view is not drawn from any legislative history, but based solely on the perceived inequity of leaving the claimant (here, the County) "at the mercy" of a state that has no interest in the outcome of the claim. The inequity may be illusory. If Monroe County has expended funds at the request of the State of New York, there is no reason to doubt that the courts or the legislature of New York will afford a remedy. And if they do not, the problem the County faces may never recur; once it is known that New York will not reimburse those who spend money at its request to assist in discharging its constitutionally imposed extradition obligations, New York's political subdivisions are unlikely to extend wholehearted cooperation in the absence of contractual commitments to reimburse. Indeed, New York's refusal to honor Monroe County's claim ranks high on the list of short-sighted governmental decisions.

While this claim remains unpaid, how much cooperation can New York expect from its counties, cities, and towns in the future in apprehending other fugitives? Even if New York were to insist that its counties render free service in apprehending fugitives,[2] a federal court, in the absence of clear legislative intent, should not interpret § 3195 to interfere with an internal policy choice of the state as to how it chooses to discharge its extradition obligations.

Third, construing § 3195 to permit suit by the County creates troublesome issues under the Eleventh Amendment. While I agree with the majority that, as a general matter, Congress has power to waive a state's immunity in aid of the constitutional authority to effect interstate rendition, the usual caution against an implied waiver in the absence of clear Congressional intent ought to be respected. *See Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *Employees v. Department of Public Health & Welfare of Missouri*, 411 U.S. 279, 285, 93 S.Ct. 1614, 1618, 36 L.Ed.2d 251 (1973). In this regard *Missouri Public Health* is especially instruc-

tive. In that case the Supreme Court, in declining to find a clear indication that Congress intended to waive a state's Eleventh Amendment immunity, relied on the fact that the state's obligation was enforceable by the United States in an action not subject to an Eleventh Amendment defense. Similarly here, the fact that New York may sue Florida to recover the expenses incurred at New York's request and equitably owed to Monroe County,[3] a suit that would encounter no Eleventh Amendment defense, is a strong consideration against assuming that Congress intended to waive Florida's immunity to suit by the County.[4]

Fourth, § 3195 should not be construed to permit suit by the County in order to assure that, with respect to matters like extradition involving relationships between the states, each state is accorded the opportunity to determine, as a matter of internal state law, how the extradition obligation will be discharged and how the costs of doing so will be borne.[5] We were advised at oral argument that some states prefer not to sue for extradition expenses, appar-

2. It may be, as the majority asserts, that Monroe County was obliged to honor the warrant issued by New York's governor. After arresting the fugitive, however, it may not have been obliged to confine him and tend to his medical needs, but may have been entitled to turn him over to state prison or hospital facilities. Arguably the arresting officer's authority under New York law to "command the aid of all police officers or other persons in the execution of the warrant," 11A N.Y.Crim.Proc.Law § 570.20 (McKinney 1971), permits imposition of an obligation on county officials to jail the fugitive and tend to his medical needs. But even if such an obligation exists, it does not necessarily follow, as a matter of state law, that the County must absorb the expense.

3. There is no need at this point to determine whether New York has a justiciable controversy with Florida prior to New York's reimbursement of Monroe County.

4. The majority's alternative argument that Florida waived its sovereign immunity by invoking the Act cannot justify imposition of a wider scope of liability than the Act creates. Florida surely subjected itself to suit by New York, but, if the Act creates no cause of action in favor of Monroe County, Florida, having made no demand upon the County, should not

be held to have waived its immunity against suit by the County.

5. In this connection, it is interesting, though admittedly not dispositive, to note the Supreme Court's decision in *Marbles v. Creecy*, 215 U.S. 63, 30 S.Ct. 32, 54 L.Ed. 92 (1909). A fugitive, arrested on a warrant of extradition issued by the Governor of Missouri, sought habeas corpus relief, challenging a host of alleged irregularities in the documentation furnished by Mississippi, the demanding state. Among these was the following statement contained in the request from the Governor of Mississippi: "This State will not be responsible for any expenses attending the execution of this requisition for the arrest and delivery of fugitives from justice." *Id.* at 66, 30 S.Ct. at 32. Noting that this provision was "unusual, not to say, extraordinary," *id.*, the Court concluded that the demanding state's disclaimer of liability for expenses "was a matter for the consideration of the *Governor*" of Missouri, *id.* at 69, 30 S.Ct. at 33 (emphasis added), and of no consequence to the validity of the fugitive's arrest. In the same vein is *Commonwealth ex rel. Osburn v. Haas*, 439 Pa. 341, 268 A.2d 85 (1970), in which a West Virginia fugitive unsuccessfully sought habeas corpus relief from a Pennsylvania Governor's extradition warrant, challenging the alleged failure of the West Virginia county in

ently believing that extradition expenses roughly balance out over time, and that, even if they do not, the amounts involved are too slight to justify either the costs of litigation or friction between cooperating states. Section 3195 should be construed to reserve to each state the decision as to whether the expenses of its political subdivisions ought to precipitate litigation with a sister state. New York should be the sole representative of its sovereign interest regarding the reciprocal obligations of the state in cases of interstate extradition. *Cf. New Jersey v. New York*, 345 U.S. 369, 372–73, 73 S.Ct. 689, 690–91, 97 L.Ed. 1081 (1953) (*per curiam*) (political subdivision of state not permitted to intervene in suit brought by one state against another in original jurisdiction action because state should be sole representative of its interest on matters of sovereign dignity). If New York wants to sue Florida, it may simply reimburse Monroe County for doing what New York asked it to do and then litigate against Florida, presumably invoking the original jurisdiction of the Supreme Court. Here New York has not chosen that course.[6] This Court ought not to assume that Con-

gress, without expressly stating such an intention, meant to permit political subdivisions to preempt each state's opportunity to elect or forgo litigation on a matter of sovereign interest.[7] The Court cites opinions of the attorneys general of New York and Florida indicating that those officers have in the past expressed no objection to suits brought by political subdivisions against demanding states or their subdivisions for extradition expenses. But even if New York happens to have no objection to this suit by Monroe County against Florida, that is no indication that Congress in 1793 or since intended to permit political subdivisions in every state, either with or without the approval of their state creator, to sue demanding states. Rather, in the absence of any indication to the contrary, Congress should be understood as having legislated a uniform rule of law that reserved to the state itself all decisions regarding the bringing of litigation with sister states on matters of interstate extradition.

Fifth, a somewhat helpful analogy may be drawn from the traditional rule for construing treaties between sovereign nations.

which the fugitive was indicted to pay extradition costs. Rejecting the fugitive's claim, the Pennsylvania Supreme Court observed, "If a dispute indeed exists over the payment of these costs, it is solely between the *executive authorities* of the States involved. . . ." *Id.* at 345, 268 A.2d at 86–87 (emphasis added).

6. In response to a suggestion during oral argument that New York should sue Florida to collect Monroe County's expenses, counsel for New York expressed the view that this was a "good idea" and added that Monroe County, while it had sought reimbursement from New York, had never requested New York to sue Florida. The colloquy cannot fairly be taken as a well-considered expression of New York's position, but it gives some indication that the unavailability of a federal court suit by Monroe County would not necessarily leave the County unreimbursed.

7. We need not decide whether Congress would have the power to authorize suit for extradition expenses brought by political subdivisions of those states that prefer not to have such litigation brought. *Compare Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907) (political subdivision of a state is a creature of the state and normally lacks any legal privilege or right assertable in conflict

with the will of its state creator), *and National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976) (Congressional prescription of minimum wages for state and municipal employees under Federal Labor Standards Act, 29 U.S.C. §§ 201–219, violative of Tenth Amendment as an impermissible interference with a state's intergovernmental functions), *with City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 78 S.Ct. 1209, 2 L.Ed.2d 1345 (1958) (upholding Congressional power under the Federal Power Act, 16 U.S.C. §§ 791a–828c, to authorize city to use FPC license to condemn state land against state wishes). But we surely should construe § 3195 to avoid the issue absent the clearest indication that Congress wishes to permit suit by political subdivisions. *Cf. Rogers v. Brockette*, 588 F.2d 1057, 1070 (5th Cir.) (narrow construction of federal statute authorizing school breakfast program, 42 U.S.C. § 1773 (1976), avoids issue of Congress' power to accord school districts local option contrary to state statute), *cert. denied*, 444 U.S. 827, 100 S.Ct. 52, 62 L.Ed.2d 35 (1979); Note, *Taking Federalism Seriously*, 90 Yale L.J. 1694, 1702–03 (1981) (emphasizing importance of state control over its internal governmental processes); Case Comment, 93 Harv.L.Rev. 586, 594–95 (1980) (same).

Treaty obligations are generally construed to run only between the contracting parties, and rights of enforcement by individuals are not recognized unless the treaty clearly indicates that method of enforcement. *The Head Money Cases,* 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884); *Dreyfus v. Von Funck,* 534 F.2d 24, 29–30 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *Canadian Transport Co. v. United States,* 430 F.Supp. 1168, 1171–72 (D.D.C.1977), *aff'd in part,* 663 F.2d 1081, 1092 (D.C.Cir.1980). In the context of 1793, this traditional canon for construing treaties is a useful indicator of how Congress expected the federal courts to interpret the reciprocal extradition obligations of the states of the Union. States are acting in their most sovereign capacities when they deal with each other on matters of interstate extradition. Federal legislation regulating such relationships is fairly to be analogized to a treaty.

For all of these reasons, I would not construe § 3195 to create a cause of action in favor of the County of Monroe against the State of Florida. I concur in that portion of Judge Mansfield's opinion that construes § 3195 not to create a cause of action in favor of the County against the State of New York.