The ONEIDA INDIAN NATION OF NEW YORK STATE, a/k/a The Oneida Indian Nation of New York, a/k/a The Oneida Indians of New York; The Oneida Indian Nation of Wisconsin, a/k/a The Oneida Tribe of Indians of Wisconsin, Inc.; and The Oneida of the Thames Band Council, Plaintiffs-Appellants-Cross-Appellees,

v.

The COUNTY OF ONEIDA, New York and The County of Madison, New York, Defendants-Third Party Plaintiffs-Appellees-Cross-Appellants,

v.

STATE OF NEW YORK, Third Party Defendant-Appellant.

Nos. 545, 546 and 643, Dockets 82–7436, 82–7486 and 82–7526.

United States Court of Appeals, Second Circuit.

Argued Jan. 18, 1983.

Decided Sept. 29, 1983.

Certiorari Granted March 19, 1984. See 104 S.Ct. 1590.

Arlinda Locklear, Washington, D.C. (Lawrence Aschenbrenner, Native American Rights Fund, Washington, D.C., Francis Skenandore, Oneida, Wis., Norman Dorsen, New York City, of counsel), for Oneida Indian Nation of Wisconsin and Oneida of the Thames Band.

Bertram E. Hirsch, Floral Park, N.Y., for Oneida Indian Nation of New York.

Jeremiah Jochnowitz, Asst. Sol. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Acting Atty. in Chief Appeals and Opinions, Albany, N.Y., of counsel), for State of N.Y.

Allan van Gestel, Boston, Mass. (Jeffrey C. Bates, Laura L. Carroll, Goodwin, Procter & Hoar, Boston, Mass., of counsel), for County of Oneida, N.Y. and County of Madison, N.Y.

Robert T. Coulter, Washington, D.C. (Curtis G. Berkey, Steven M. Tullberg, Indian Law Resource Center, Washington, D.C., of counsel), for amicus curiae The Houdenosaunee.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

All three parties appeal from the judgment of the Northern District of New York, Edmund J. Port, *Judge*. The defendants, Counties of Oneida and Madison, New York, appeal from Judge Port's decision holding them liable for wrongful possession of plaintiffs' land. 434 F.Supp. 527 (N.D.N.Y.1977). Plaintiffs Oneida Indian Nation of New York State, Oneida Indian Nation of Wisconsin, and Oneida of the Thames Band Council (collectively the "Oneidas"), as well as the Counties appeal from Judge Port's decision of October 5, 1981, on damages. Finally, third party defendant State of New York appeals from Judge Port's ruling of May 5, 1982, that it must indemnify the Counties for any damages assessed. We affirm each of Judge Port's three rulings, but remand for further proceedings on the calculation of damages.

The three plaintiffs in this case are the descendants of the Oneida Indian Nation which inhabited central New York for

many years until shortly after the Revolutionary War. The Oneidas were part of the Six Nations or Iroquois, the most powerful tribe in the Northeast.[1] Their land extended from the Pennsylvania border north to the St. Lawrence River, from the shores of Lake Ontario to the western foothills of the Adirondack Mountains.[2] During the Revolutionary War, the Oneidas were active allies of the colonists against the British. Their support prevented the Iroquois from taking a unified stand against the colonists—an important achievement for the confederated states.

After the War, the United States rewarded the Oneidas in the Treaty of Fort Stanwix, 7 Stat. 15 (October 22, 1784), by securing them "in the possession of the lands on which they are settled." Later, two additional treaties further secured the Oneidas in the possession of their land. See Treaty at Fort Harmar, 7 Stat. 33 (January 9, 1789); Treaty with Six Nations, 7 Stat. 44 (November 11, 1794). The settlers of the new nation, however, in their constant fever to expand soon invaded the Indians' territory. Thus, under increasing pressure from its white residents, the State of New York in 1788 purported to purchase most of the Oneidas' land—nearly five million acres.[3] The Oneidas retained about 300,000 acres near Oneida Lake.

As the pressure of new settlements everywhere continued to increase, the Indians became restive. In recognition of the frequently inequitable land purchases and to prevent Indian retaliation, the newly created federal government took an active role in protecting and securing the Indians in the possession of their land. President Washington and his Secretary of War, Henry Knox, encouraged Congress to enact legislation which recognized "that the Indian tribes possess the right of the soil of all lands within their limits, respectively, and that they are not to be divested thereof, but in consequence of fair and bonafide purchases, made under the authority, or with the express approbation, of the United States." American State Papers, I Indian Affairs 53 (1834). Accordingly, Congress passed the Trade and Intercourse Act of 1790, Ch. 33, 1 Stat. 137 (hereinafter "1790 Act") which provided:

> [t]hat no person shall be permitted to carry on any trade or intercourse with the Indian tribes, without a [federal] license ... [and] [t]hat no sale of land made by Indians ... shall be valid to any person or persons, or to any state ... unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

Id. at 137–38.[4]

The 1790 Act, however, was primarily declarative. It provided few enforcement mechanisms for protecting federal or tribal interest. Because it did little to stem the increasing illegal occupation of Indian lands, Congress in 1793 enacted a second Trade and Intercourse Act that added criminal penalties for illegally occupying Indian lands and authorized the President to remove trespassers from the land. Trade and Intercourse Act of 1793, Ch. 19, § 8, 1 Stat. 329, 330–31 (hereinafter "1793 Act"). The 1793 Act also provided that "informants" could enforce the section imposing fines on

---

1. The Iroquois were composed of six tribes: the Cayuga, Mohawk, Oneida, Onondaga, Seneca, and Tuscarora.

2. Earlier in their history, before the influx of settlers, the Iroquois' land "extended from the hills of New England to the Mississippi River and from upper Canada into North Carolina." F. Cohen, Handbook of Federal Indian Law 417 (University of New Mexico Press reprint of 1942 ed.) (Federal Indian Law).

3. Much of this land is presently the subject of another lawsuit, see Oneida Indian Nation of

New York v. New York, No. 78–104 (N.D.N.Y. filed December 5, 1979).

4. Section four of the 1790 Act states in full: And be it enacted and declared, That no sale of lands made by any Indians, or any nation or tribe of Indians within the United States, shall be valid to any person or persons, or to any state, whether having the right of preemption to such lands or not, unless the same shall be made and duly executed at some public treaty, held under the authority of the United States.

violators and collect one-half of the fine assessed.

Despite these statutory prohibitions, the State of New York attempted in 1795 to obtain Indian lands without the requisite federal approval. Throughout the ensuing months, the federal authorities repeatedly urged New York State Governor Clinton and his successor Governor John Jay to seek and secure the appointment of federal commissioners before the State negotiated any purchase of Indian lands. *See* 434 F.Supp. at 534–35. Despite this, the State sought an agreement with the Oneidas during the summer of 1795, over the express remonstrance of the federal authorities. *See id.* at 534. These negotiations led to the sale on September 15, 1795, in Albany, in contravention of the 1793 Act, of approximately 100,000 acres of the Oneidas' reservation. As the district court noted, however, the circumstances surrounding the Oneidas' assent to the purchase were fraught with irregularities. *Id.* 535. First, the Oneidas virtually never signed treaties outside their aboriginal land, yet the treaty was signed in Albany outside their aboriginal land boundaries. Second, normally the Oneidas' treaties were agreed to by unanimous consensus of the tribe; here, however, powers of attorney were given to individuals, none of whom were chiefs, to negotiate the transaction. Third, the State purchased the land for approximately fifty cents per acre. Within two years, the State in turn sold much of the land to white settlers for about $3.53 per acre.

Social and economic forces, including poverty, famine, alcoholism, and pressures on the Oneidas to move West resulted in the alienation of virtually all of their remaining New York acreage. Between 1795 and 1846, twenty-five more treaties between the State and the Oneidas were consummated, enabling the State to divest the Oneidas of all but a few hundred acres. Only two of these treaties (concerning land not here in question) were made with federal supervision and approval.[5] Furthermore, the State passed a statute that divided up the tribal landholdings and gave individual Indians a right to sell.

New York's abuse of the Oneidas was not accomplished without protest. Shortly after the 1784, 1787, and 1788 land purchases, the Oneidas contacted the federal government in protest over what they perceived as improper, deceitful, and overreaching conduct by the State. *See American State Papers,* I *Indian Affairs* 139 (1834). Their protest continued, especially between 1840 and 1875, and between 1909 and 1965. *See* 434 F.Supp. at 536.

Finally, in 1970 the Oneidas brought suit in the Northern District of New York claiming that the 1795 cession of land violated the Nonintercourse Act, and that the land was unconscionably purchased for an inadequate price. The complaint sought damages for the fair rental value of 871.92 acres which were part of the 1795 land transfer, for the period from January 1, 1968 to December 31, 1969. The district court on November 4, 1971, dismissed the complaint ruling that it asserted only a state law claim. Our affirmance over one judge's dissent, 464 F.2d 916, 918 (2d Cir. 1972), was unanimously reversed by the Supreme Court which held:

> Tribal rights [are] entitled to the protection of federal law, and with respect to Indian title based on aboriginal possession, the 'power of Congress . . . is supreme.'
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> The rudimentary propositions that Indian title is a matter of federal law and can be extinguished only with federal consent apply in all of the States, including the original 13.

414 U.S. 661, 669–70, 94 S.Ct. 772, 778–79, 39 L.Ed.2d 73 (1974) (footnotes and citation omitted).

On remand, Judge Port trifurcated the proceedings, dividing the case into separate

---

**5.** It has been estimated that the "State of New York acquired from the Indians all the western one-half of that state by nearly 200 treaties not participated in by the United States Government." *Federal Indian Law* at 420 n. 24.

trials on the issues of liability, damages, and indemnity. First, Judge Port held that the State's 1795 purchase violated the 1793 Act. He later assessed the Counties $16,694 in damages plus interest. In addition, Judge Port over the State's principal objection on eleventh amendment grounds held that the State must indemnify the Counties for all damages assessed.

## I.

### LIABILITY

Plaintiffs claim two bases for a finding of liability in this case: federal common law and the 1793 Nonintercourse Act.[6]

(A) *Federal common law.*

The Counties assert that the Oneidas had no federal common law rights at the time of the 1795 purchase, and alternatively that whatever common law action there may have been was preempted by the Trade and Intercourse Act. We reject both contentions.

■ The interrelationship of the Indian nations and the United States—including its constituent states—early in the new nation's history was recognized as involving uniquely federal interests. The Constitution reflected this concern by delegating to the federal government the authority to "regulate Commerce with Foreign Nations, and among the several states, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. This federal interest in regulating Indian affairs was enunciated not only in treaties, *see, e.g., Treaty of Fort Stanwix, supra,* and statutes, *see, e.g.,* Trade and Intercourse Act of 1790, *supra,* but also in the recognition by the courts of the availability of a federal common law action to vindicate Indian land claims. The Supreme Court referred to this proposition in *Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), one of its earliest cases involving the transfer of Indian land. Although the case involved a title dispute between non-

Indians, the Court subsequently interpreted the case to stand for the general principle "that an action in ejectment could be maintained on an Indian right to occupancy and use . . . . This is the result of the decision in *Johnson v. M'Intosh." Marsh v. Brooks,* 49 U.S. (8 How.) 223, 232, 12 L.Ed. 1056 (1850). Furthermore, the Court repeatedly has emphasized that this Indian right to occupancy and use is a federal right. *See, e.g., Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 667, 670, 94 S.Ct. 772, 777, 778, 39 L.Ed.2d 73 (1974) (it is a "rudimentary proposition" that after the Constitution was "adopted, these tribal rights to Indian lands became the exclusive province of the federal law."); *see also Mohegan Tribe v. Connecticut,* 638 F.2d 612, 626 (2d Cir.), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3124, 69 L.Ed.2d 981 (1981) ("the extinguishment of all Indian title was meant to be a matter of federal concern"). In the prior appeal in this case, the Supreme Court alluded to the existence of a common law action on several occasions in mandating the exercise of federal jurisdiction. "[A] tribal right of occupancy, to be protected, need not be 'based upon a treaty, statute, or other formal government action.' . . . nevertheless [it is] entitled to the protection of federal law . . . ." *Oneida Indian Nation,* 414 U.S. at 669, 94 S.Ct. at 778, quoting *U.S. v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941). "Absent federal statutory guidance, the governing rule of decision would be fashioned by the federal court in the mode of the common law." *Id.* 414 U.S. at 674, 94 S.Ct. at 781. We conclude that the Oneidas may assert a federal common law action to recover damages for the Counties' wrongful possession of their land.

■ The Counties, however, argue that this federal common law action was preempted by the enactment of the Trade and Intercourse Act. They cite *Milwaukee v. Illinois,* 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981), in which the Supreme

---

**6.** Judge Port found a violation of the Trade and Intercourse Act of 1793. In formulating a rem-

edy, however, he looked to the common law.

Court held that a subsequently enacted federal statute preempted the federal common law cause of action it previously had upheld in *Illinois v. Milwaukee,* 406 U.S. 91, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972). In *Illinois v. Milwaukee* the Supreme Court recognized the existence of a federal common law action for abatement of a public nuisance in polluted interstate waters. Nine years later, however, the Court found in *Milwaukee v. Illinois* that such an action could no longer be maintained. In the intervening years, Congress had passed the Federal Water Pollution Control Act Amendments of 1972, Pub.L. 92–500, 86 Stat. 816 (hereinafter "FWPCA"). Under these lengthy amendments and their appurtenant regulations, it is illegal for anyone to discharge pollutants into American waters without a permit. 33 U.S.C. §§ 1311, 1342 (1976 ed. & Supp. III). Moreover, the discharge permitted is restricted to effluent limitations established by Environmental Protection Agency regulations. The statute provided for dual enforcement both by the federal government and by citizen suits. *See id.* §§ 1319 & 1365. It specifies the relief that may be obtained, the ranges of monetary penalties for various violations, and authorizes imprisonment in certain cases. *Id.* § 1319(c). Other aspects of the statute include grants for research, water treatment works, and water pollution standards. *See generally id.* §§ 1251 et seq. Under these circumstances the Court concluded that "Congress ha[d] not left the formulation of appropriate [pollution] standards to the courts ... but rather ha[d] occupied the field through the establishment of a comprehensive regulatory program supervised by an expert administrative agency." *Milwaukee v. Illinois,* 451 U.S. at 317, 101 S.Ct. at 1792. Thus, when Congress "speaks directly to a question," *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978), that originally "rested on federal common law, the need for such an unusual exercise of lawmaking by federal courts disappears." *Milwaukee v. Illinois,* 451 U.S. at 314, 101 S.Ct. at 1791.

This case is quite different. The Trade and Intercourse Acts were not comprehensive statutes. They did not speak directly to the question of the Indians' ability to enforce their possessory rights by an action in ejectment. Rather, the Acts augmented the protection of Indian property rights previously afforded by federal common law by adding an additional statutory prohibition. This statute, *inter alia,* voided all land transactions in which Indians were a party that were consummated without federal approval. Furthermore, the 1793 Act both authorized the intervention of the President and the federal government on behalf of the Indians, and established criminal penalties for violations of the Act.[7] None of these statutory provisions expressly subsumed the common law modes of relief. There is no evidence to suggest that Congress intended to deny common law remedies to the Indians. In an analogous area involving congressional extinguishment of Indian land titles, the Supreme Court has stated that evidence of such congressional intent should be "plain and unambiguous," and would "not be lightly implied in view of the avowed solicitude of the Federal Government for the Welfare of its

---

7. Section eight states in full:

*And be it further enacted,* That no purchase or grant of lands, or of any title or claim thereto, from any Indians or nation or tribe of Indians, within the bounds of the United States, shall be of any validity in law or equity, unless the same be made by a treaty or convention entered into pursuant to the constitution; and it shall be a misdemeanor, in any person not employed under the authority of the United States, in negotiating such treaty or convention, punishable by fine not exceeding one thousand dollars and imprisonment not exceeding twelve months, directly or indirectly to treat with any such Indians, nation or tribe of Indians, for the title or purchase of any lands by them held, or claimed: *Provided nevertheless,* That it shall be lawful for the agent or agents of any state, who may be present at any treaty, held with Indians under the authority of the United States, in the presence, and with the approbation of the commissioner or commissioners of the United States, appointed to hold the same, to propose to, and adjust with the Indians, the compensation to be made for their claims to lands within such state, which shall be extinguished by the treaty.

Indian wards." *U.S. v. Santa Fe Pacific,* 314 U.S. at 346, 354, 62 S.Ct. at 255. Neither should we imply a congressional intention to extinguish the Indians' common law remedy for vindicating their property rights in the absence of plain and unambiguous evidence of such a desire. Accordingly, we hold that the district court had jurisdiction to grant relief under federal common law.

(B) *Trade and Intercourse Act.*

Judge Port premised liability in large part on the State's violation of the 1793 Trade and Intercourse Act. On appeal, the State apparently does not question Judge Port's holding that the Act was violated. The 1793 Act explicitly required federal approval of a land purchase such as the 1795 cession. No such federal approval was obtained. The Counties, on the other hand, proffer five arguments in seeking to avoid liability: first, that the Trade and Intercourse Acts did not provide for a private suit for the enforcement of their provisions; second, that if such a suit could be maintained it abated upon expiration of the 1793 Act; third, that the Oneidas' claims are barred by the statute of limitations; fourth, that the claims are non-justiciable, and fifth, that the federal government subsequently ratified the 1795 transaction.

*Implied Cause of Action.*

It is beyond dispute that the Nonintercourse Acts were enacted for the protection of Indian tribes as beneficiaries. However, "the focus of [our] inquiry is on whether Congress intended to create a remedy," *California v. Sierra Club,* 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981). In resolving that question the Supreme Court has recently given us guidance:

> Our approach to the task of determining whether Congress intended to authorize a private cause of action has changed significantly, much as the quality and quantity of federal legislation has undergone significant change. When federal statutes were less comprehensive, the Court applied a relatively simple test to determine the availability of an implied private remedy. If a statute was enacted

for the benefit of a special class, the judiciary normally recognized a remedy for members of that class. *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916). Under this approach, federal courts, following a common-law tradition, regarded the denial of a remedy as the exception rather than the rule.

\*  \*  \*  \*  \*  \*

> In view of the absence of any dispute about the proposition prior to the decision of *Cort v. Ash* in 1975, it is abundantly clear that an implied cause of action under the CEA was a part of the 'contemporary legal context' in which Congress legislated in 1974. *Cf. Cannon v. University of Chicago,* 441 U.S. [677] at 698–699 [99 S.Ct. 1946, 1958–1959, 60 L.Ed.2d 560].

*Merrill Lynch, Pierce, Fenner & Smith v. Curran,* 456 U.S. 353, 374–75, 381, 102 S.Ct. 1825, 1837, 1841, 72 L.Ed.2d 182 (1982).

When, prior to *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), an implied private remedy was part of the "contemporary legal context" in which Congress legislated, Congress will be deemed to have intended to preserve the remedy. *Id.,* 456 U.S. at 379–80, 102 S.Ct. at 1839–40; *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 95 S.Ct. 1917, 1923, 44 L.Ed.2d 539 (1975).

Application of these basic principles leads us to the conclusion that in enacting the Nonintercourse Acts Congress must have expected that they would be enforced by private actions since they were clearly intended for the benefit of the Indian tribes. The federal statutory structure was extremely simple and had not even approached the complexity which led to the adoption of the *Cort v. Ash* requirements. Indeed, the right to enforce the Acts through private actions has been assumed by various lower federal courts. *See, e.g., Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899, 903 (D.Mass.1977); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 784 (D.Conn.1976); *Narragansett Tribe of Indians v. Southern Rhode*

*Island Land Development Corp.,* 418 F.Supp. 798, 805 & n. 3 (D.R.I.1976). Private enforcement has also been favored because of the federal government's poor performance of its statutory obligation to protect the Indians.[8] The congressional directives embodied in the Nonintercourse Acts frequently have been disregarded by the executive branch. *See, e.g., Narragansett Tribe,* 418 F.Supp. at 806 & n. 4. Thus, by necessity, Indian tribes have been permitted to enforce the Acts. In any event we believe that under conventional *Cort v. Ash* analysis, the Indians have an implied private cause of action to enforce the Nonintercourse Acts' proscriptions.

*Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), outlines four factors to be used in determining whether Congress has intended that individuals may bring private suits to enforce a particular statute:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted) (emphasis in original). We consider these four factors in that order.

### (1) *Beneficiaries.*

The language and purpose of the 1793 Act are unequivocal in their purpose to protect the Indians. Section 1 provides that "no person shall be permitted to carry on any trade or intercourse with the Indian Tribes without a [federally granted] license . . . ." 1 Stat. at 329. Violators of the Act "shall forfeit all the merchandise offered for sale to the Indians," and they also may be imprisoned, and fined up to $1,000. *Id.* §§ 3 & 5, at 329–30. Furthermore, "no purchase or grant of lands . . . from any Indians [without federal approval] shall be of any validity . . . ." *Id.* at § 8, at 330–31. The statute's purpose was "to prevent unfair, improvident or improper disposition by Indians of land owned or possessed by them to other parties . . . ." *Federal Power Commission v. Tuscarora Indian Nation,* 362 U.S. 99, 119, 80 S.Ct. 543, 555, 4 L.Ed.2d 584 (1960); *see also Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 664, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979) ("a major purpose of these acts as they developed was to protect the rights of Indians to their property").

### (2) *Legislative Intent.*

The legislative history of the Nonintercourse Acts, which is sparse and incomplete, furnishes no clear expression on the question of whether Congress intended to create a private right of action for damages. Congressional committee reports generally are unavailable, and floor debates were seldom recorded. The absence of legislative history is neither unusual nor fatal. "The legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." *Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 1956, 60 L.Ed.2d 560 (1979). Nonetheless, "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to

---

**8.** *See, e.g., United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir.1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957):

> The numerous sanctimonious expressions to be found in the acts of Congress, the statements of public officials, and the opinions of courts respecting "the generous and protective spirit which the United States

properly feels towards its Indian wards," *Oklahoma Tax Comm. v. United States,* 319 U.S. 598, 607, 63 S.Ct. 1284, 1288, 87 L.Ed. 1612, and the " 'high standards for fair dealing' required of the United States in controlling Indian affairs," *United States v. Alcea Band of Tillamooks,* 329 U.S. 40, 47, 67 S.Ct. 167, 170, 91 L.Ed. 29, are but demonstrations of a gross national hypocrisy.

make such a remedy available." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). "[C]ongressional intent can be inferred from the language of the statute, the statutory structure," *Northwest Airlines, Inc. v. Transport Workers,* 451 U.S. 77, 94, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981), "or in the circumstances of [the statute's] enactment." *Transamerica,* 444 U.S. at 18, 100 S.Ct. at 246. *See also Cannon v. University of Chicago,* 441 U.S. at 698–99, 99 S.Ct. at 1958–59; *California v. Sierra Club,* 451 U.S. 287, 296 n. 7, 101 S.Ct. 1775, 1780 n. 7, 68 L.Ed.2d 101 (1981).

■ The circumstances surrounding the enactment of the 1793 statute show that Congress intended to provide maximum protection of Indian land—and that this protection included the power to commence a private action.[9] The earlier 1790 Act in large part was due to the efforts of President George Washington and his Secretary of War, Henry Knox. Both men were "of high integrity and had extensive experience in Indian affairs." F. Prucha, *American Indian Policy in the Formative Years:* The Indian Trade and Intercourse Acts of 1790–1834 at 43–44 (1962) (hereinafter "*American Indian Policy*"). President Washington personally appeared before Congress and warned that legislation was needed to bolster the faltering relations with Indian Tribes. *See Sen-Exec. Journal,* 1st. Cong., 1st Sess. 20–24 (1789); I *Annals of Congress* 933 (1790).[10] Secretary Knox urged that if it were "declared by law ... that the Indians possess the right to all their territory which they have not fairly conveyed, and

that they should not be divested ... [except by] treaties made under the authority of the United States, the foundation of justice and peace would be laid." *American State Papers,* I *Indian Affairs* 53 (1834). The 1790 Act which followed embodied these "principles of justice and moderation, as [would] enforce the approbation of the dispassionate and enlightened part of mankind ... [and it represented a policy of] conciliation of the Indians by negotiation ... liberality, express guarantees of protection ... and developed trade." *Id.* at 41, 44.

Section 4 of the 1790 Act stated that "no sale of lands made by any Indians ... shall be valid ... unless the same shall be made ... under the authority of the United States." 1 Stat. at 138. Section 4's prohibition against non-federally approved Indian land sales did not carry with it any substantive penalties for its violation,[11] nor were there any mechanisms for enforcing its prohibition. Nonetheless, Congress must have intended that section 4 would be enforced by some party or institution. *See Transamerica,* 444 U.S. at 18–19, 100 S.Ct. at 246–247. In *Transamerica,* the Supreme Court construed a securities' statute that was constructed similarly to the 1790 Act. Section 215 of the Investment Advisors Act of 1940 states that all waivers of compliance and "[e]very contract made in violation of any provision of this subchapter ... shall be void...." 15 U.S.C. § 80b–15. Like section 4 of the 1790 Act, 80b–15 simply declared that certain transactions were void. It did not explicitly provide for enforcement. Under these circumstances, the

**9.** We reject the Counties' initial contention that Indian tribes lacked capacity to sue in federal court, and thus Congress could not have intended to create a private cause of action on their behalf. Although suits by tribes may have been rare, the reasons for this were cultural, not legal:

> Except for the Cherokee, who had experienced some intermarriage and infusion of Anglo-American legal concepts, the tribes were ignorant of American legal processes and were still politically organized in traditional fashions, making resort to American courts virtually impossible.

Clinton & Hotopp, *Judicial Enforcement of the Federal Restraints on Alienation of Indian Land: The Origins of the Eastern Land Claims,* 31 Me.L.Rev. 17, 46 (1979).

**10.** As Secretary Knox said in a letter to North Carolina Governor Blount, quoted in *American Indian Policy* at 41: "The Indians have constantly had their jealousies and hatreds excited by the attempts to obtain their land."

**11.** Sections 2 and 3 which dealt with licensed traders, on the other hand, expressly included enforcement by the United States and perhaps by "informants" suits. *See* 1 Stat. at 137–38.

Supreme Court found that Congress intended a private right of action to enforce section 80b–15.

> By declaring certain contracts void, [section 80b–15] by its terms necessarily contemplates that the issue of voidness under its criteria may be litigated somewhere. At the very least Congress must have assumed that [section 80b–15] could be raised defensively in private litigation to preclude the enforcement of an investment advisors contract. But the legal consequences of voidness are typically not so limited. A person with the power to avoid a contract ordinarily may resort to a court to have the contract rescinded and to obtain restitution of consideration paid.

\* \* \* \* \* \*

> For these reasons we conclude that when Congress declared in [section 80b–15] that certain contracts were void, it intended that the customary legal incidents of voidness would follow.

*Transamerica,* 444 U.S. at 18, 19, 100 S.Ct. at 246, 247.

By analogy, if the State violated the 1790 Act, logically the Indians would have had "the customary legal incident" of a private right of action to enforce its strictures. With no express enforcement provisions accompanying section 4, a statutory interpretation that did not permit a private right of action would render section 4 unenforceable.

As the 1790 Act was set to expire in 1793, Congress passed the Trade and Intercourse Act of 1793 in which section 8 incorporated the original language of the 1790 Act which had voided all Indian land transactions negotiated without federal approval. In addition, it provided that violation of the section was a misdemeanor punishable by a fine and imprisonment.[12] The statute also authorized the executive branch, at the discretion of the President, to remove violators from Indian land. Other sections regulating trade with the Indians also were added to the Act, with penalties for their violation.[13]

These upgraded remedies were designed to correct the perceived shortcomings of the 1790 statute. The 1790 Act had failed to protect the Indians adequately from predatory encroachment, trade, and land purchases. President Washington had urged Congress in his 1791 annual address to enact an "efficacious provision ... inflicting adequate penalties upon all those who, by violating [the Indians'] rights, shall infringe the treaties and endanger the peace of the Union." 'Third Annual Address, President George Washington,' 1 *Messages and Papers of the President,* 105 (Richardson, ed., 1896). He renewed his plea in late 1792 stating, "I cannot dismiss the subject of Indian affairs without again recommending to your consideration the expediency of more adequate provision for giving energy to the laws throughout our interior frontier ...." Speech of President George Washington, 2d Cong., 2d Sess., November 6,

---

**12.** Violation of the 1793 Act was punishable by a fine up to $1,000 and imprisonment not to exceed twelve months. 1793 Act § 8, 1 Stat. at 330.

**13.** The significant additions to the Trade and Intercourse Act included: Section one prohibited trade with Indians without a federally granted license. To obtain such a license, a licensee had to submit a $1,000 bond. Section two permitted the recall of the license, as well as recourse to the bond for any breaches of conditions placed on the licensee. The third section penalized unlicensed trading with Indians by imposing forfeiture of the merchandise traded, and a fine and imprisonment up to $100 and 30 days respectively. Crimes committed against Indians on Indian land were to be treated as if committed on non-Indian land under section 4. Section 5 proscribed settlement on Indian land with an attendant fine between $100 and $1,000 and imprisonment not to exceed twelve months for any violations of the section. The President was also authorized to remove unlawful settlors. Section 6 required a special license "to purchase any horse of an Indian, or of any white man in the Indian territory," and provided that persons purchasing horses without such a special license would forfeit both the horse and a sum not more than one hundred dollars, nor less than thirty dollars. One half of the forfeiture would be distributed to the prosecuting "informant" and one-half would go to the federal government.

1972, 1 *American State Papers: Indian Affairs,* at 119. In response, Congress enacted the more stringent 1793 statute, to increase the law's effectiveness through additional enforcement mechanisms. There is no suggestion that Congress intended to subtract from the statutes' remedies. Accordingly, we agree with the district court that the private right of action that existed under the 1790 Act remained intact in the 1793 Act.

Our conclusion that Congress intended that private parties would have a cause of action to enforce the 1793 Act is further supported by other evidence of congressional intent. For example, in 1822 Congress amended the Trade and Intercourse Act of 1802—which essentially continued the 1793 Act's land alienation provision—to place the burden of proof on white persons in all cases in which Indians were parties. 3 Stat. 682, 683 (1822). This pertained to "all trials about the right of property in which Indians shall be party on one side, and white persons on the other." *Id.* This provision only makes sense if Congress had intended the Trade and Intercourse Acts to authorize Indians to appear as plaintiffs to enforce the Acts, as well as to be defendants.

Furthermore, the 1793 Act's misdemeanor provision only appears to apply to "negotiators" of Indian land cession transactions. The State, rather than Counties, thus would appear to be subject to the criminal penalties of the statute. *Cf. Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971) ("ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity."). Without the availability of a private right of action against the Counties the only remedy would be the executive's discretionary removal of violators. Presidential authority to remove intruders even when exercised, however, often proved ineffectual. *American Indian Policy* at 158–66.[14] Thus, absent a right of action, the Oneidas would have a right under a statute that was unenforceable. For all these reasons, we conclude that Congress intended that Indian litigants could bring private suits to enforce the 1793 Act's prohibition of certain land cessions.[15]

(3) *Statutory Purpose.*

The purposes of the 1793 Trade and Intercourse Act are best served by the implication of a private right of action. "[A] major purpose of the Acts as they devel-

---

**14.** *Cf. Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 374, 88 S.Ct. 982, 986, 19 L.Ed.2d 1238 (1968):

[T]he general power of the United States to safeguard an allotment affected the capacity of the Indian to protect that allotment. Furthermore, the Bureau of Indian Affairs, which is the agency of the Department of the Interior charged with fulfilling the trust obligations of the United States, is faced "with an almost staggering problem in attempting to discharge its trust obligations with respect to thousands upon thousands of scattered Indian allotments. In some cases, the adequate fulfillment of trust responsibilities on these allotments would undoubtedly involve administrative costs running many times the income value of the property." H.R.Rep. No. 2503, 82d Cong., 2d Sess., 23 (1952). Recognizing these administrative burdens and realizing that Indian's right to sue should not depend on the good judgment or zeal of a government attorney, the United States has indicated its support of petitioners' position that Indians have a capacity to sue under the oil and gas lease.

(footnote omitted).

**15.** The only remnants of legislative history available indicate that President Washington, who was the moving force behind the 1790 and 1793 Acts, thought that they permitted the Indians to bring private causes of action. Cornplanter, Chief of the Seneca Indians, another tribe of the Six Nations, had met with President Washington in December 1790 to present their complaints about certain land transactions entered into during the prior decade. *American State Papers,* I *Indian Affairs* 139 (1834). Washington assured Cornplanter that at least after 1790, "the case [was] entirely altered; ... any treaty formed and held without [the federal government's] authority [was] not binding." *Id.* Moreover, "[i]f ... you have any just cause of complaint against and can make satisfactory proof thereof, the federal courts will be open to you for redress, as to all other persons." *Id.* This speech was printed and communicated to Congress on January 11, 1792. *Id.* 142–43. Congress, therefore, was made aware of President Washington's perception of the reach of Indian law.

oped was to protect the rights of Indians to their properties." *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 664, 99 S.Ct. 2529, 2536, 61 L.Ed.2d 153 (1979). *See also U.S. v. Southern Pacific Transportation Co.,* 543 F.2d 676, 697 (9th Cir.1976) (the statute was meant to "prevent the steady diminution of Indian territory ... unless ... by public treaty."). The Supreme Court has stated that it is "decidedly receptive" to the implication of a "private remedy [that] is necessary or at least helpful to the accomplishment of the statutory purpose ...." *Cannon v. University of Chicago,* 441 U.S. at 703, 99 S.Ct. at 778. A private right of action is necessary in view of the virtually complete failure of other statutory remedies to provide the Indians with any real protection. *See United States v. Ahtanum Irrigation District,* 236 F.2d 321 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957); *American Indian Policy* at 147, 158–66.

### (4) *Federal or State Concern.*

As stated above the Indians have a federal common law possessory cause of action. Moreover, it is well settled that laws affecting the Indians are principally the province of federal, not state law. *See, e.g., Oneida Indian Nation,* 414 U.S. at 669, 94 S.Ct. at 778; *Hughes v. Washington,* 389 U.S. 290, 292–93, 88 S.Ct. 438, 439–40, 19 L.Ed.2d 530 (1967); *Board of Commissioners v. United States,* 308 U.S. 343, 350–51, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832).

Thus, all four prongs of the *Cort v. Ash* test have been met. Accordingly, we hold that the Oneidas had a private right of action to enforce the Trade and Intercourse Act of 1793. We now turn to defendant's other arguments.

### *Abatement of the Cause of Action.*

■ The Counties argue that even if the Oneidas could have brought suit under the 1793 Act, that cause of action has since abated. The 1793 Act expired after "two years, and from thence to the end of the then next session of Congress ...." 1 Stat. at 332. Appellants assert, quoting *The*

*General Pinkney,* 9 U.S. (5 Cranch) 281, 283, 3 L.Ed. 101 (1809), that after the termination of the 1793 Act, "no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force unless some special provision be made for that purpose by statute." We disagree. The pertinent provision of the 1793 Act remains operative. 25 U.S.C. § 177 (1983) states that "[n]o purchase ... of lands ... from any Indian nation or tribe of Indians shall be of any validity ... unless same be made by treaty ... under the authority of the United States." Under these circumstances, "the better and prevailing rule is that so much of the original as is repeated in the later statute without substantial change is affirmed and continued in force without interruption." *Great Northern Ry. Co. v. United States,* 155 F. 945, 948 (8th Cir.1907). Abatement is inapplicable according to this proposition because the underlying rationale of abatement is inapposite. Abatement "[i]mputes to Congress an intention to avoid inflicting punishment at a time when it would no longer further any legislative purpose...." *Hamm v. City of Rock Hill,* 379 U.S. 306, 313, 85 S.Ct. 384, 390, 13 L.Ed.2d 300 (1964). Because the 1793 statute remains essentially in force in 25 U.S.C. § 177, the continued invalidity of the illegal transactions would "further a legislative purpose," namely, protection of Indian land title.

### *Miscellaneous Objections to Liability.*

Appellants raise three other arguments against liability: the statute of limitations, non-justiciability, and subsequent federal ratification of the 1795 transaction.

### (1) *Statute of Limitations.*

■ Appellants claim that this suit, instituted 175 years after the cause of action accrued is time-barred. We disagree. State statutes of limitation are inapplicable. As we recently emphasized, in cases involving Indian land claims "[d]efenses based upon state adverse possession laws and state statutes of limitation have been consistently rejected." *Mohegan Tribe v. State*

*of Connecticut,* 638 F.2d at 614–15 & n. 3. Moreover, state statutes of limitation are not borrowed "if their application would be inconsistent with the underlying policies of the federal statute." *Occidental Life Ins. Co. v. EEOC,* 432 U.S. 355, 367, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977). Applying New York's statute would permit a violation of the 1793 Act to go unremedied, and thus would be patently inconsistent with the Trade and Intercourse Acts. In addition, we have recently rejected the assertion that such actions are time-barred noting that "[i]t is clearly established that a suit by the United States as trustee on behalf of an Indian tribe is not subject to state delay-based defenses. It would be anomalous to allow the trustee to sue under more favorable conditions that those afforded the tribes themselves." *Oneida Indian Nation of New York v. New York,* 691 F.2d 1070, 1083–84 (2d Cir.1982) (citation omitted).

■ Suits brought by the United States on behalf of Indian tribes are governed by the special statute of limitations set forth in 28 U.S.C. § 2415 which provides some guidance in the present situation. Under section 2415(c) there is no time limitation if the action is to "establish the title to, or right of possession of, real or personal property." Section 2415(a) provides that actions in contract seeking money damages that accrued prior to July 1966 are timely if filed prior to December 31, 1982. Thus, had the United States brought the instant suit in 1970 instead of the Oneidas, it would not have been time-barred. We conclude that "at the very least, suits by tribes should be held timely if such suits would have been timely if brought by the United States States." *Id.* at 1084.

### (2) *Justiciability.*

Appellants advance several reasons in support of their assertion that the Oneidas' claims present non-justiciable political questions:

(1) determination of the lawfulness of and remedy for the Counties' occupancy has been committed to the President;

(2) determination of the Plaintiffs' claim entails a choice among contenders for the right to govern the area covered by the 1795 conveyance;

(3) determination of the Plaintiffs' claim entails the allocation of tribal property, which is committed to Congress;

(4) determination of these questions by a federal court entails the risk of multifarious pronouncements on the foregoing questions by the different branches of the federal government.

■ Our holding that the Oneidas have a federal common law cause of action and an action to enforce the 1793 Trade and Intercourse Act negates defendants' argument that the exclusive remedy against illegal occupiers is committed to the President. *Accord, e.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Oneida Indian Nation of New York v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *Joint Tribal Council of the Passamaquoddy Tribe v. Morton,* 528 F.2d 370 (1st Cir.1975); *Fort Mojave Tribe v. Lafollette,* 478 F.2d 1016 (9th Cir.1973); *Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899 (D.Mass, 1977); *Schaghticoke v. Kent School Corp.,* 423 F.Supp. 780 (D.Conn.1976); *Narragansett Tribe v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798 (D.R.I.1976).

■ The Counties' next two propositions also must be rejected. They assert that the effect of the district court's decision is to transfer the sovereignty of over 100,000 acres of New York State land "to at least three tribal factions who are, and who have been for years, feuding over which is the proper government tribe." This, they assert, is an issue "on which the district court must defer 'to the political departments.' " *Id.,* quoting, *Baker v. Carr,* 369 U.S. 186, 215, 82 S.Ct. 691, 709, 7 L.Ed.2d 663 (1962).

The district court found that the three plaintiffs were the direct descendants of

the Oneida Indian Nation that inhabited the land in question in 1795. 434 F.Supp. at 532. Judge Port based this decision on expert testimony, implicit United States' verification stemming from annuity payments, and recognition by the Bureau of Indian Affairs. *Id.* at 532–33. Appellants have given us no reason to disturb this finding. Hence, there is no need to intrude on internal tribal governance; moreover, the appropriate allocation of damages amongst the plaintiffs is not a question that is presently before us on appeal.[16] Furthermore, as we observed in *Oneida Indian Nation v. New York,* "[t]o our knowledge no Indian land claim has ever been dismissed on non-justiciability grounds." 691 F.2d at 1081.

■ Finally, the Counties assert that our holding will have catastrophic ramifications. We rejected this argument in *Oneida Indian Nation v. New York,* in which we stated "we know of no principle of law that would relate the availability of judicial relief inversely to the gravity of the wrong sought to be addressed." *Id.* at 1083; *see generally id.*

### (3) *Subsequent Federal Ratification.*

■ The Counties assert as a third defense to liability that the United States subsequently ratified the 1795 transaction in two federally approved treaties between the Oneidas and the State. The Treaty of June 1, 1798, describes the 1795 transaction as a "purchase." It also provides in relevant part:

> The said [Oneida] Indians do cede, release, and quitclaim to the people of the State of New York, forever, all the lands within their reservation, to the westward and southwestward of a line from the northeastern corner of the lot No. 54, *in the last purchase from them* running northerly to a button wood tree, . . . standing on the bank of the Oneida lake[.]

Treaty of 1798 (emphasis added). The "last purchase" referred to in this treaty, the parties agree, was the 1795 transaction.

The federally approved Treaty of June 4, 1802 also mentions lands "heretofore ceded . . . to the State of New York," ostensibly a reference to the 1795 purchase. In addition, both treaties refer to lots 54 and 59 which were part of the 1795 transaction.

We agree with the district court which cited *United States v. Santa Fe Pacific* in its holding that the reference in these treaties were not a "plain and unambiguous" ratification of the 1795 transaction. In *United States v. Santa Fe Pacific,* the Supreme Court refused to find that an ambiguous congressional pronouncement had acted to extinguish Indian land title. In so doing, the Court stated that " '[u]nquestionably it has been the policy of the federal government from the beginning to respect the Indian right of occupancy, which could only be interfered with or determined by the United States.' " 314 U.S. at 345, 62 S.Ct. at 251, quoting *Cramer v. United States,* 261 U.S. 219, 227, 43 S.Ct. 342, 344, 67 L.Ed. 622 (1923). Extinguishment of the Indians' title could not be "lightly implied" because "[c]ertainly, it would take plain and unambiguous action to deprive the Walapais [Indian tribe] of the benefits of that policy." *Id.* at 346, 354, 62 S.Ct. at 251, 255.

In arguing that the "plain and unambiguous" standard is inapplicable, the Counties attempt to distinguish the claimed ratification herein from the extinguishment of Indian title involved in *United States v. Santa Fe Pacific.* The distinction, however, is a meaningless one. Ratification also would serve to extinguish the Oneidas' title. We find the Counties' argument wanting for a second reason. Even under the standard propounded by the Counties it cannot be said that isolated references to land boundaries in the 1798 or 1802 treaties, which are little more than "metes and bounds" descriptions, are sufficient to constitute ratification of the 1795 transaction. Moreover, neither treaty makes any reference to the validity of the underlying 1795 "purchase." There is no evidence that the federal au-

---

**16.** *See* 434 F.Supp. at 538 n. 20 ("Since this phase of the trial is solely to determine liability, the rights of the individual plaintiffs to share in a recovery can be left for another day.").

thorities were then aware of any claim of illegality of the prior land sale.

## II.

## DAMAGES

After a separate trial on the issue of damages, Judge Port on October 5, 1981 awarded the Oneidas $9,060 plus interest against Madison County, and $7,634 plus interest against Oneida County for their unlawful use and occupation of the Oneidas' land for the years 1968 and 1969.[17] Judge Port arrived at these amounts by calculating the fair rental value of the land as unimproved for the years 1968 and 1969. He allowed the Counties a set-off for improvements because they occupied the land in good faith, and without knowledge of the unlawfulness of their continued occupation.

The appellants raise three issues regarding Judge Port's decision. The first is whether the Counties as allegedly good faith occupiers of the Oneidas' land can be held liable in damages. The second issue concerns the district court's ruling that the Counties could set-off against the damages assessed the amount of improvements they made on the land. And the third question is whether the law of eminent domain is relevant to the calculation of damages.

### A. Availability of a Damage Remedy.

The Counties claim first that they did not violate the 1793 Trade and Intercourse Act, and second that if they did, the Act explicitly provides the exclusive remedies for its

violation. They note that it was the state that violated the 1793 Act in 1795 and not the Counties,[18] which were subsequent occupiers of the land.[19] Even bad faith occupation would not violate the Act, the Counties assert, because section 8 regulates the disposition, not the occupation of Indian land. The Counties also contend that, in any event, they are good faith occupiers, and that the 1793 Act was not intended to assess damages against those holding land in good faith.

■■■ The Counties, however, do not question Judge Port's holding that the 1795 transfer of Indian land was void.[20] In effect the Counties have asked us to find that their good faith occupation of Oneida land can act as a subsequent validation of the 1795 transaction. To accept the Counties' argument, however, would render the Trade and Intercourse Acts wholly ineffective.[21]

■■■ As we previously stated, the Oneidas are entitled to enforce the Nonintercourse Act's voiding of the 1795 purchase. This is what the Oneidas' lawsuit seeks to do. Their suit closely corresponds to the common law action for ejectment in which a plaintiff need only establish his right to possession. See New York v. White, 528 F.2d 336, 338 (2d Cir.1975); see also Taylor v. Anderson, 234 U.S. 74, 34 S.Ct. 724, 58 L.Ed. 1218 (1914). The Oneidas' claim is based on their present right of possession, see Oneida Indian Nation, 414 U.S. at 666, 94 S.Ct. at 776, and the Counties' liability is premised on their continued occupancy of Oneida land in violation of the Act. Under

17. As we noted earlier, see supra note 6, the district court found a violation of the 1793 Trade and Intercourse Act, but appeared to resort to the common law in formulating a damage remedy. We understand the district court to have examined the common law only to assist it in formulating a statutory damage remedy.

18. Oneida County was established in 1798 and Madison County in 1806. J. Lomenzo, Manual for the Use of the Legislature of the State of New York 310 (1938 ed.).

19. The district court was not able to ascertain when the Counties began their occupation of

the Oneidas land, determining only that it was sometime in the 1800's.

20. Moreover, Judge Port's determination was amply supported. See 434 F.Supp. at 537–40.

21. When Congress intended a provision in the same statute to contain an intent or good faith element it simply did so expressly. See § 6, 1 Stat. at 330 ("every person, who shall purchase a horse, knowing him to be brought out of Indian territory, by any person or persons not licensed, as above, to purchase the same shall forfeit the value of such horse.").

the common law the good or bad faith of the occupant is irrelevant to his liability. *See, e.g., Green v. Biddle,* 21 U.S. (8 Wheat.) 1, 80–81, 5 L.Ed. 547 (1823); *Miceli v. Riley,* 436 N.Y.S.2d 72, 74–75, 79 A.D.2d 165 (1981). The Counties' occupation, regardless of their good or bad faith, of Indian land obtained in a transaction that violated the 1793 Act renders them liable.

■ The Counties also contend, however, that if their possession does violate the Act, the only remedies for their violation are expressly set out in the statute. *See supra* note 10. It follows from our conclusion that the Oneidas have a private cause of action that Congress intended the concomitant damage remedy that flows with it to be available; it is a "customary legal incident" of the private action. *See Transamerica,* 444 U.S. at 19, 100 S.Ct. at 247. The Counties' conclusory statement that the statute provides the exclusive remedies for its violation, without citation to any legislative history, ignores the Supreme Court's repeated admonitions: "The creation of one explicit mode of enforcement is not dispositive of congressional intent with respect to other complementary remedies." *California v. Sierra Club,* 451 U.S. at 295 n. 6, 101 S.Ct. at 1780 n. 6, citing *Transamerica,* 444 U.S. at 29 n. 6, 100 S.Ct. at 252 n. 6 (White, J., dissenting); *Cort v. Ash,* 422 U.S. at 82–83 n. 14, 95 S.Ct. at 2089–2090 n. 14. Accordingly, we agree with Judge Port that the Counties are responsible for the continuing violation of the 1793 Act and are liable in damages for that violation.

B. *Improvements' Set-Off.*

Since the Counties assumed possession of the Oneidas' land they have erected or completed several improvements on the land. They asserted, and the district court held, that the Counties were entitled to a set-off of the value of these improvements against the Oneidas' fair rental value damages. The improvements on the 871.92 total acres were: 809 acres used as highways; the 47.22 acre Champlain Battleground Park; a

2.07 acre parcel used as a fire department radio tower and a 13.13 acre gravel bed. To arrive at the rental value less improvements the court simply calculated the fair rental value of the land as unimproved.

■ Neither party appears to question Judge Port's fair rental value method of calculating damages.[22] Thus, the only dispute is whether the district court could set-off the value of improvements against the fair rental value damages. The court applied the common law rule that a good-faith occupier of land is entitled to a set-off for improvements. *See Green v. Biddle,* 21 U.S. (8 Wheat.) at 59, 5 L.Ed. 547; *see also Miceli v. Riley,* 436 N.Y.S.2d at 74; *Berney v. Brodie,* 272 N.Y.S.2d 881, 26 A.D.2d 679 (1966); 42 C.J.S. Improvements § 7 at 432 (1944). The Oneidas argue first that the common law rule should not be applied because it would frustrate the purposes of the 1793 Act by rewarding trespassers and encouraging unlawful alienations and occupations. We disagree. Presumably, the common law rule is based on the premise that to require forfeiture by the good-faith occupier of the value of its improvements would work an injustice and provide little in the way of added deterrence. A contrary rule would not discourage good faith trespassers from their illegal occupation because it is based on a mistaken, though still wrongful, belief of ownership. We are not prepared to require the good faith non-active wrongdoer, here a political subdivision, to forego the value of improvements it made in the absence of any policy benefits. If good faith occupiers were not credited with the value of their improvements, this would lead to the anomalous result that they usually would suffer higher damages than bad faith occupiers because good-faith occupants are more likely to make improvements.

■ The Oneidas next question the district court's finding that the Counties held the land in good faith. We find this issue more troublesome. The burden of

---

22. *See Utah Power & Light Co. v. United States,* 243 U.S. 389, 411, 37 S.Ct. 387, 392, 61 L.Ed. 791 (1917); *New Orleans v. Gaines,* 82 U.S. (15 Wall.) 624, 21 L.Ed. 215 (1872).

proving good faith, rests on the Counties. *See, e.g., United States v. Wilson,* 523 F.Supp. 874, 900–901 (N.D.Iowa 1981); *Deakyne v. Lewes Anglers, Inc.,* 205 F.Supp. 415 (D.Del.1962); *Church of God Prophecy v. Ferris,* 244 N.Y.S.2d 279, 281, 19 A.D.2d 934 (1963). The record does not show, however, whether the district judge placed the burden of proof on the Counties or on the Oneidas. Judge Port's opinion merely states that "there is no evidence to connect the defendants, these two Counties, with [the State's] act of bad faith; nor is there any other evidence indicating that they were bad-faith occupiers of the land in 1968 or 1969 . . . ." At trial, however, the Counties only proffered evidence that they had been acting in good faith since 1970. Inasmuch as the Counties had possession of the Oneidas' land since sometime in the 1800's, it is not enough that they established good faith since 1970. On the basis of the present record, however, we are not prepared to overturn Judge Port's determination that the Counties had acted in good faith. We leave clarification of the issue of good faith to the district court on remand.

### C. *Computing Damages at 90% of the Fair Rental Value.*

■ The Oneidas' last argument is that the lower court erred in calculating at less than 100% of the fair rental value certain lands through which highways presently run. Judge Port stated in his opinion:

That plaintiffs were entitled to possession the same as any landowner is before an eminent domain and he was deprived of that possession by the conduct of the defendant so that the damages sustained by both plaintiffs can be viewed as substantially the same and, generally speaking, the rules of eminent domain could be applied here and do justice to the parties.

Judge Port then analogized the Oneidas' claim to a request for "just compensation" for a road easement condemnation, and calculated the fair rental of 90% of the value of the property. We cannot agree that such a discount is appropriate. It treats the Counties' occupation as if it were a lawfully

obtained easement. We see no reason why there should be any diminution of the damages even if the uses were for a public purpose. Accordingly, on remand the district court should calculate damages without any discount.

### III.

### INDEMNIFICATION

The Counties filed third-party complaints against the State seeking indemnification of any damages assessed against them for their possession of the Oneidas' land. The State moved to dismiss the complaints, and the Counties cross-moved for summary judgment. Judge Port granted the Counties' motion over the State's objections that the court lacked subject matter jurisdiction, that the complaint failed to state a cause of action, and that the State's eleventh amendment immunity to suit barred the action.

### A. *Subject Matter Jurisdiction*

■ The State maintains that the district court erred in holding that it had ancillary jurisdiction over the indemnity action, contending that the indemnity suit does not arise out of the same core of operative facts as the Oneidas' claim against the Counties. Any indemnity liability, the State argues, would stem from the State's disposition of the land to the Counties, and not from its acquisition of the land in violation of the Trade and Intercourse Act. We disagree. In order to establish their right to indemnity the Counties must show that they are compelled to pay monetary damages as a result of the State's wrongful conduct—here, New York's violation of the 1793 Act. *See Great American Ins. Co. v. United States,* 575 F.2d 1031, 1035 (2d Cir.1978); *Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 465 F.Supp. 790 (S.D.N.Y.1978); *Taft v. Shaffer Trucking, Inc.,* 383 N.Y.S.2d 744, 52 A.D.2d 255 (1976). The Counties' indemnity claim, therefore, is based largely on the same facts that established the Counties' liability. The Oneidas alleged and proved that the State had violated the 1793 Trade and Intercourse

Act. Plaintiffs established, moreover, that the Counties were wrongfully occupying this land that had devolved from the State to the Counties. These same facts also establish the legal and equitable basis for the Counties' indemnity action. *See supra* section (II)(A). When the action for indemnification arises out of the same core of facts, the court's jurisdiction is "ancillary to its jurisdiction over the main action," *United States v. Farr & Co.,* 342 F.2d 383, 384 n. 1 (2d Cir.1965), and no independent basis for jurisdiction is necessary. *See* Fed.R.Civ.P. 14(a); *Agrashell, Inc. v. Bernard Sirotta Co.,* 344 F.2d 583, 585 (2d Cir.1965); *Dery v. Wyer,* 265 F.2d 804, 807 (2d Cir.1959); *Ayer v. General Dynamics Corp.,* 82 F.R.D. 115, 121 (S.D.N.Y.1979); 3 J. Moore, Moore's Federal Practice § 14.26, at 14–108 & n. 6 (1982).

## B. *Failure to State a Cause of Action.*

■ We find no merit in the State's assertion that there is no cause of action for indemnity. "It is nothing short of simple fairness to recognize that '[a] person who, in whole or in part, has discharged a duty which is owed by him but which as between himself and another should have been discharged by the other, is entitled to indemnity.' Restatement, Restitution, § 76." *McDermott v. City of New York,* 50 N.Y.2d 211, 406 N.E.2d 460, 428 N.Y.S.2d 643, 646 (1980). Therefore, when "payment by one person is compelled, which another should have made ... a contract to reimburse or indemnify is implied by law." *Brown v. Rosenbaum,* 287 N.Y. 510, 518–19, 41 N.E.2d 77 (1942); *see also Dunn v. Uvalde Asphalt Paving Co.,* 175 N.Y. 214, 217–18, 67 N.E.

439 (1903); *Oceanic S.N. Co. v. Compania Transatlantica Espanola,* 134 N.Y. 461, 465–68, 31 N.E. 987 (1892); *City of Brooklyn v. Brooklyn City R.R. Co.,* 47 N.Y. 475, 486–87 (1872); Leflar, *Contribution and Indemnity Between Tortfeasors,* 81 U. of Pa.L.Rev. 130, 147 (1932); Meriam & Thornton, *Indemnity Between Tortfeasors: An Evolving Doctrine in the New York Court of Appeals,* 25 N.Y.U.L.Rev. 845 (1950).

## C. *Eleventh Amendment Immunity.*

The State argues that the eleventh amendment is a bar to the Counties' claim against it. The amendment provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

■ We agree with the district court that the eleventh amendment is not a bar to action against the State of New York. The State's acquisition of the Oneidas' land was in subordination to the power of Congress to legislate regarding Indian lands, pursuant to Article 1, Section 8 of the Constitution.[23] The 1790 and 1793 Acts of Congress placed New York on notice that Congress had exercised its power to regulate commerce with the Indians.[24] Thus, anything New York thereafter did with respect to Indian lands carried with it a waiver of the State's eleventh amendment immunity. *See Edelman v. Jordan,* 415 U.S. 651, 672, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *Employees v. Missouri Public Health & Welfare Dept.,* 411 U.S. 279, 283–84, 93 S.Ct. 1614, 1617–18, 36 L.Ed.2d 251 (1973).[25]

**23.** "By empowering Congress to regulate commerce, then, the States necessarily surrendered any portion of their sovereignty that would stand in the way of such regulation." *Parden v. Terminal Ry.Co.,* 377 U.S. 184, 192, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964).

**24.** Section 8 of the 1793 Act prohibited purchases of Indian lands not negotiated "under the authority of the United States." *See supra* note 7. Similarly, section 4 of the 1790 Act stated "[t]hat no sale of lands made by Indians ... shall be valid to any person or persons, or to any state ...."

**25.** The Supreme Court has not stated the necessity of proving state waiver of immunity in the fourteenth amendment context. *See, e.g., Fitzpatrick v. Bitzer,* 427 U.S. 445 at 456, 96 S.Ct. 2666 at 2671, 49 L.Ed.2d 614. By ratifying the fourteenth amendment after the eleventh amendment, the states can be said to have waived their immunity in all cases in which Congress exercises its enforcement power under section 5 of the fourteenth amendment.

In *Parden v. Terminal Ry. Co.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), the state of Alabama owned and operated a railroad in interstate commerce. Alabama had commenced its railroad operation twenty years after the enactment of the Federal Employers Liability Act, 45 U.S.C. §§ 51–60 ("FELA"). This Act permitted a railroad employee to sue his or her employer for personal injuries sustained in the course of employment. The Court found that Congress had conditioned operation of a railroad on acceptance of potential FELA liability and any damage suits arising therefrom; by starting the railroad after the FELA had been enacted, Alabama had constructively consented to a waiver of its immunity. 377 U.S. at 192, 84 S.Ct. at 1212; *see also County of Monroe v. State of Florida*, 678 F.2d 1124, 1133 (2d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983). The importance of the chronology in *Parden* became readily apparent after the Supreme Court's subsequent decisions in *Edelman* and *Employees*. Unlike *Parden*, "[i]n neither of those cases did the state have sufficient notice that it would be liable for damages if it participated in the federal programs." *County of Monroe*, 678 F.2d at 1134. In *Employees*, Missouri had been operating hospitals long before the 1966 amendment extended the coverage of the FELA to state employees. In *Edelman*, similarly, Illinois was faced with a federal statute that appeared to impose only the sanction of future funding curtailment, and not a damage suit for benefits wrongfully withheld. Neither Illinois nor Missouri thus had "sufficient notice that it would be liable for damages if it participated in the federal programs." *Id.* As a result, neither state had a "real option to discontinue its participation in the activities subject to federal regulation and forego the accompanying benefits." *Ibid.* The choice between terminating "vital public services" and waiving eleventh amendment immunity was "no true choice at all." *Employees*, 411 U.S. at 296, 93 S.Ct. at 1624 (Marshall, J., concurring).

The instant case is analogous to *Parden*. The 1793 Act was enacted two years prior to the state's purchase of Oneida land. Thus, the State had adequate notice that it was subject to the statute's strictures. *See generally supra*. As the district court noted, on several occasions President Washington and Secretary Knox urged New York to comply with the 1793 Act. *See* 434 F.Supp. at 534–35. The state chose to ignore their admonitions. The State's proprietary purchase of Indian land thus was an act wholly outside "the sphere that is exclusively its own and enter[ed the state] into activities subject to congressional regulation . . . ." *Parden*, 377 U.S. at 196, 84 S.Ct. at 1215. The State's act, "with its 'eyes wide open,'" *County of Monroe*, 678 F.2d at 1134, quoting *Edelman*, 415 U.S. at 693, 94 S.Ct. at 1370 (Marshall, J., dissenting), "subjects itself to that regulation as fully as if it were a private person or corporation." *Parden*, 377 U.S. at 196, 84 S.Ct. at 1215. Therefore, we agree with the district court's determination that New York impliedly consented to a waiver of its eleventh amendment immunity.

\*     \*     \*     \*     \*     \*

We affirm the judgment of the district court which held the Counties liable for illegal occupation of the Oneida land, and its judgment that the State of New York must indemnify the Counties for any damages assessed against them.

We remand for further proceedings to determine the good faith claims of the Counties as they bear on any set-off for improvements made on the property, and for recomputation of damages.

MESKILL, Circuit Judge, dissenting:

I respectfully dissent.

The implications of the majority's decision are far reaching and I believe that the decision is wrong. The present dispute involves 871.92 acres of land and a judgment for $16,694, plus interest, for two years' use thereof, not an unusually significant amount in and of itself. But the court does not specify any limiting principles in this area. I see nothing in the majority's opinion which, when coupled with our decision in *Oneida Indian Nation of New York v.*

*New York,* 691 F.2d 1070 (2d Cir.1982), would prevent the Oneida or any other tribe from suing for the full value of all land taken from them at any time during our nation's history in contravention of federal law—to say nothing of the possibility of bringing an action for ejectment. Courts should be reluctant to invite such potentially staggering claims on the skimpy authority relied on today by the majority.

This is not to deny the wrongs that Indian tribes have suffered. They do exist and surely require attention. However, the remedy should not be created by a court of law acting in an environment of legal uncertainty. These are essentially political problems which require a comprehensive solution that the judiciary cannot provide in one sitting.[1] Today's decision is likely to interfere with rather than advance the federal government's policies towards Indians.

To decide that Indian land claims should be resolved by judicial fiat is not only unwise, it is also unnecessary. The Indian tribes have remedies available without resort to the federal courts. Congress has established administrative procedures to resolve Indian land claims and the federal government can sue in federal court to enforce Indian land rights.[2] If the existing federal administrative mechanism is ineffective, the Indians' proper remedy is not in the federal courts, but rather in Congress.

### I

The majority holds today that the Oneida may maintain a direct action to recover damages for wrongful occupancy. Despite the majority's claim to the contrary, this is truly a novel legal principle. There never has been, and this Court should not now create, a federal common law action. No case has ever held that an Indian tribe may maintain a direct action for damages based upon federal common law.

From the outset of the Union, Indians were considered wards of the United States; the federal government assumed the role of their guardian. *See, e.g., United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 7, 58 L.Ed. 107 (1913); *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831) (Marshall, C.J.) ("[T]hey are in a state of pupilage; their relation to the United States resembles that of a ward to his guardian. They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants . . . .); *cf. United States v. Kagama,* 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886) ("From their very weakness and helplessness, so largely due to the course of dealing of the Federal Government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.").

From the special guardianship relation between the United States and the Indian tribes, it can be inferred that the Indians

1. The Indian tribes are considered sovereigns "which, by government structure, culture, and source of sovereignty, are in many ways foreign to the constitutional institutions of the Federal and State Governments." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 71, 98 S.Ct. 1670, 1683, 56 L.Ed.2d 106 (1978); *see also Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 139–40, 102 S.Ct. 894, 902–03, 71 L.Ed.2d 21 (1982); *United States v. Wheeler,* 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1085–86, 55 L.Ed.2d 303 (1978). Relations with Indian tribes can thus be analogized to relations with foreign nations. The Supreme Court has shown great reluctance to interfere with or take actions that might embarrass the federal political branches' conduct of foreign affairs, *see, e.g., Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976) (plurality opinion); *First Nat'l City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 767, 92 S.Ct. 1808, 1813, 32 L.Ed.2d 466 (1972) (plurality opinion); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 431–33, 84 S.Ct. 923, 941–43, 11 L.Ed.2d 804 (1964); *Mexico v. Hoffman,* 324 U.S. 30, 35, 65 S.Ct. 530, 532, 89 L.Ed. 729 (1945); *The Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 146, 3 L.Ed. 287 (1812) (Marshall, C.J.).

2. *See United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941); *United States v. Candelaria,* 271 U.S. 432, 46 S.Ct. 561, 70 L.Ed. 1023 (1926); *Cramer v. United States,* 261 U.S. 219, 43 S.Ct. 342, 67 L.Ed. 622 (1923).

should be subject to liabilities under federal law only when Congress sets up a statutory scheme. This has long been settled law. *See, e.g., United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940) (reaffirming that tribal sovereign immunity is coextensive with that of the United States; "[t]hese Indian Nations are exempt from suit without Congressional authorization."). Similarly, it follows that their federal rights should also be based on specific congressional acts. Far from a leap of logic, this is equally settled law:

> The civil rights incident to States and individuals as recognized by what may be called the "law of the land" have not been accorded either to Indian nations, tribes, or Indians. *Whenever they have asserted a legal capacity in the maintenance of their rights, it has been in pursuance of some statute of the United States* specially *conferring upon them the civil rights of suitors. In all the cases in this court in which the interest of an Indian tribe has been the subject of litigation the proceeding has been under special statute conferring the right upon the claimant to bring a suit.* The ordinary jurisdiction as to persons has never been sought to enforce against the United States the fulfillment of their obligations or the discharge of their duties.

*Jaeger v. United States,* 27 Ct.Cl. 278, 284–85 (1892) (emphasis supplied).[3]

Special statutes giving Indians the rights of suitors were necessary because it was inconceivable to lawmakers and judges in the era of early American common law that Indian tribes would resort to courts of law to enforce their legal rights. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) at 17, 8 L.Ed. 25 (Marshall, C.J.) ("At the time the constitution was framed, the idea of appealing to an American court of justice for an assertion of right or a redress of wrong, had

perhaps never entered the mind of an Indian or of his tribe."). Thus, viewed from a common law perspective, it is apparent that there never existed a federal common law private cause of action for damages.

Assuming *arguendo* that a federal common law cause of action in favor of the Indians existed, it was preempted by the Trade and Intercourse Acts.

When Congress addresses directly and comprehensively a question previously governed by federal or state common law, that common law is preempted. *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). While the majority does not dispute this, it finds that Congress did not intend to preempt the field because the Trade and Intercourse Acts were not comprehensive statutes. This explanation ignores existing Supreme Court case law on preemption and improperly addresses the issue of congressional intent.

The majority points out that the Acts "did not speak directly to the question of the Indians' ability to enforce their possessory rights by an action in ejectment."[4] But Congress need not specifically legislate on a subject in order to preempt a particular field. In *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941), the Supreme Court held a Pennsylvania alien registration statute invalid under the Supremacy Clause partly because the state statute interfered with the federal scheme of registration, even though the state and federal statutes were not explicitly contradictory and there was no express congressional intent to override state legislation. The Court noted that "[e]xperience has shown that international controversies of the greatest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted, by a government." 312 U.S. at

---

**3.** *See Karrahoo v. Adams,* 14 F.Cas. 134 (C.C. D.Kan.1870) (No. 7,614) (Federal circuit court had no jurisdiction in a case involving a noncitizen Indian whose complaint did not raise a federal question).

**4.** It is not surprising that the Act did not expressly refer to an "existing" federal common law right. Of all the cases cited by the majority to indicate the existence of such a cause of action, *not one* was decided before 1793.

64, 61 S.Ct. at 402. The Court thus reasoned that state law which potentially conflicted with federal law in this sensitive area had to fall because the federal government was the agent of foreign policy in our country and, as the agent, it had determined that a particular scheme of registration was necessary in order to avoid friction with other nations.

The majority ignores the fact that the legislation at the heart of the instant dispute addresses issues of intergovernmental relations as sensitive as those in *Hines.* As the majority notes, President Washington and Secretary of War Knox urged congressional protection of Indian lands in order to reassure Indians who had grown "restive." This protection was provided by the 1790 Act; criminal and other sanctions were added in 1793 in order to put teeth in the 1790 Act. The statutes at issue in *Hines* and in the instant dispute were passed for the same purpose, to avoid war. There can be no justification for finding preemption of state statutory law in the former case but not preemption of federal common law in the latter. Indeed, the present holding turns the normal presumptions about preemption on their respective heads, as federal courts are usually quicker to find preemption of federal common law than state law. *In re Oswego Barge Corp.,* 664 F.2d 327 (2d Cir.1981). *See Illinois v. Outboard Marine Corp.,* 680 F.2d 473, 478 (7th Cir. 1982).

The majority also tries to determine whether the early congressional scheme was comprehensive from a late twentieth century perspective. But, we must remember that it is the intent of the 2nd Congress which we search for here, not the perceived views of a Congress elected many years later. It is true that the 1790 and 1793 Acts were not comprehensive by today's standards, but they did proscribe certain acts and provide civil and criminal sanctions. Given the hypertechnical nature of the law in the late 18th century, it is unrealistic to believe that Congress intended to allow remedies concurrent to those explicitly promulgated.

The majority's reliance on the language in *United States v. Santa Fe Pacific Railroad Co.,* 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941), is inappropriate, inasmuch as that case involved a mid-19th century statute which allegedly abolished the Indians' aboriginal rights. There, the Supreme Court was talking about the extinguishment of undisputed title to land, not the preemption of a questionable right of a ward to a private cause of action.

## II

The majority states that the Nonintercourse Acts were passed to protect Indian tribes and determines, on the basis of the language cited in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 374–75, 102 S.Ct. 1825, 1837, 72 L.Ed.2d 182 (1982), that when a statute is enacted in order to benefit a special class of beneficiaries, the judiciary will normally recognize a remedy for class members if the statute was passed prior to *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Therefore, reasons the majority, when Congress passed the aforementioned Acts it must have intended that the beneficiaries would be able to enforce their rights by a private action. While superficially appealing, this argument lacks the support of either precedent or legislative history. *Merrill Lynch* does not address the question whether a private cause of action should be implied where Congress has explicitly granted the federal government the power to sue to protect the rights of the particular group benefited by the statute.

The majority is correct that the Acts were passed in order to protect Indian tribes. However, it takes a great leap of logic to suppose that the Congresses that passed the Acts intended the Indian tribes to have a private cause of action for violations of these Acts. It is difficult to believe that at that time Congress would have left it to the courts to imply such a significant and far reaching remedy, particularly when we remember that the Acts were passed in order to avoid war with the Indian tribes.

Obviously Congress never intended the remedy to be available.

I believe that the lower courts that have assumed a private cause of action for a violation of the Acts, *see, e.g., Mashpee Tribe v. New Seabury Corp.,* 427 F.Supp. 899, 903 (D.Mass.1977); *Schaghticoke Tribe of Indians v. Kent School Corp.,* 423 F.Supp. 780, 784 (D.Conn.1976); *Narragansett Tribe of Indians v. Southern Rhode Island Land Development Corp.,* 418 F.Supp. 798, 805 & n. 3 (D.R.I.1976), are in error. They use neither legislative history nor valid precedent [5] to support their position.

Similarly, the need for private enforcement because of poor government performance in this area should not affect the outcome here. The government's failure to enforce Indian rights vigorously provides a strong argument for the need for private enforcement. That argument should be made to Congress, however. We should not perform a legislative function. Furthermore, when construing a statute passed in the late 18th century, we should not consider events which transpired, or failed to transpire, in the subsequent 200 years in order to shed light on congressional intent.

The majority states that even under traditional *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), criteria, a private cause of action may be maintained. I believe the opposite conclusion to be the case here.

This case does not satisfy the second prong of the *Cort* test, namely, whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one." 422 U.S. at 78, 95 S.Ct. at 2088. I believe that congressional silence on this question indicates a desire not to include a private cause of action as a remedy.

The majority states that Congress intended in the 1793 Act to provide "maximum protection" to Indian land. Assuming this to be true, Congress probably never believed private action necessary in order to accomplish maximum protection. The Act provided for criminal sanctions for violations and included a provision authorizing the executive branch to remove violators from Indian land.[6] These sanctions if utilized would appear to be full and adequate remedies for the conduct that Congress wished to proscribe. Furthermore, it would have been an easy matter for Congress to provide for a private cause of action in favor of Indian tribes or to expressly continue an existing common law remedy if one existed. The failure to do so indicates to me that Congress either did not wish to enact such a remedy or that it never considered the issue. Either explanation would produce the same result—no private cause of action was intended.

The court's reference to *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18–19, 100 S.Ct. 242, 246–247, 62 L.Ed.2d 146 (1979), is inappropriate. There, the Court dealt with a statute, section 215 of the Investment Advisers Act of 1940, that only declared certain contracts void. Neither sanctions, nor remedies, nor any mechanism for voiding contracts were explicitly provided. By contrast, the 1790 Act, *as amended* by the Act of 1793, *did* explicitly provide sanctions and an enforcement mechanism. Indeed, these later enforcement provisions were included *because* the 1790 Act lacked them.

By contrast, the instant dispute is analogous to the claim in *Transamerica* for a private cause of action under section 206 of the Investment Advisers Act. Congress expressly provided judicial and administrative means to enforce section 206 rights, including criminal penalties and authorization to the SEC to enjoin compliance with the Act. 444 U.S. at 20, 100 S.Ct. at 247. The Court stated that "[i]n view of these express pro-

---

**5.** These cases all rest upon decisions that recognized a private right of action to Indians when the United States had the power to sue on the same cause of action and to seek the same relief. They do not support the proposition that if the government has a statutorily based power to pursue a remedy, the Indians may bring their own action for a different remedy that does not arise out of the same statute.

**6.** *See* Majority op. n. 12.

visions for enforcing the duties imposed by § 206, it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action.' " *Id.* (citation omitted). As the Supreme Court noted, "[I]t is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. 'When a statute limits a thing to be done in a particular mode, it includes the negative of any other mode.' " *Id.* at 19–20, 100 S.Ct. at 247 (citation omitted).

The same reasoning is applicable to the present case. Because Congress explicitly provided for remedies and sanctions in the 1793 Act, it is "highly improbable" that it forgot to include a private cause of action. This is particularly true in view of the importance that Congress and the President placed on the matter of Indian affairs in the 1790s.

The majority's characterization of the 1822 Act is not convincing. The provision in the 1822 Act referring to Indians as parties does not only make sense, as the majority claims, "if Congress had intended the Trade and Intercourse Acts to authorize Indians to appear as plaintiffs to enforce the Acts, as well as to be defendants." This provision also applies to a suit in which the government seeks to enforce Indians' rights on their behalf. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). In such a case, the Indians in question would be the real parties in interest. Congress could have been indicating that in this type of action the burden of proof would not be on the government as plaintiff-guardian.

In sum, I believe there is no basis upon which the majority can imply a private cause of action by Indians to recover damages for wrongful possession. To hold otherwise is a novel proposition of law, with consequences too broad to be established on such shaky grounds. Demands for redress of violations of the Acts are better directed to the other branches of the federal government.

I would reverse and remand with directions to dismiss the complaint.